**Jung Ja MALANDRIS, Plaintiff-Appellee,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, Defendant-Appellant.**

Nos. 77–1957, 78–1855.

United States Court of Appeals, Tenth Circuit.

Argued May 16, 1979.

Decided March 4, 1981.

Order on Rehearing In Banc March 31, 1983.

Logan, Circuit Judge, dissented and filed opinion.

Seymour, Circuit Judge, concurred and dissented and filed opinion in which McKay, Circuit Judge, joined.

Seth, Chief Judge, dissented and filed opinion.

William P. Rogers, New York City (Guy C. Quinlan, James N. Benedict, John A. Karaczynski of Rogers & Wells, New York City, and Donald K. Bain and John M. Kobayashi of Holme, Roberts & Owen, Denver, Colo., were also on brief), for defendant-appellant.

William R. Fishman, Denver, Colo. (David H. Drennen of Fishman, Gengler & Geman, P.C., Denver, Colo., was also on brief), for plaintiff-appellee.

J. Conrad Metcalf and William A. Trine, Boulder, Colo., were on brief, for the Colorado Trial Lawyer's Association, as amicus curiae.

## ORDER ON REHEARING IN BANC

Before SETH, Chief Judge, and HOLLOWAY, BARRETT, DOYLE, McKAY, LOGAN and SEYMOUR, Circuit Judges.[*]

The in banc court was unable to reach a majority opinion or judgment for disposition of this appeal.[1] Upon being re-polled on the issue of disposition in light of the stalemate, the court, by a vote of four to three,[2] determined to sustain the judgment of the panel, but otherwise adheres to the views expressed in the opinions issued simultaneously with this order.

It is therefore ordered that the judgment of the panel is sustained and that such judgment is re-entered as follows:

In No. 77–1957, we conclude that the judgment should be affirmed, provided that the plaintiff accepts a reduction in the punitive award to $1,000,000. Therefore the cause is remanded to the district court with directions that an order be entered providing that if, within a reasonable time to be fixed by the district court, the plaintiff accepts a reduction of the judgment by reducing the punitive damages award to $1,000,000 or thus a total judgment of $2,030,000, with costs and interest as provided in and accruing from the entry of the original judgment, then the judgment as so modified shall be final; otherwise, an order shall be entered granting a new trial of the cause.

It is further ordered that there be published following this order the original opinion by Judge Holloway for a majority of the panel, now adhered to as expressing the views of Judges Holloway, Barrett and Doyle. There will also be published herewith the concurring and dissenting opinion of Judge Seymour, in which Judge McKay joins, and the dissenting opinions of Chief Judge Seth and Judge Logan.

IT IS SO ORDERED.

Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. (Merrill Lynch or defendant hereafter) appeals from a judgment awarding plaintiff Jung Ja Malandris damages in the amount of $4,030,000—$1,030,000 as compensatory damages and $3,000,000 as punitive damages—on claims of common law fraud and intentional infliction of emotional distress (No. 77–1957), asserting numerous errors. Merrill Lynch also seeks reversal of the district court's order denying

---

[*] The Honorable Robert H. McWilliams, Circuit Judge, did not participate in the consideration or disposition of this appeal or the rehearing in banc thereon.

1. In No. 78–1855, *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Incorporated,* a separate appeal was taken from an order of the district court, 447 F.Supp. 543, denying relief under Rule 60(b) F.R.Civ.P. In that appeal the original panel opinion and judgment of the court was that the order of the district court be affirmed. No rehearing or rehearing in banc was sought from that ruling and that order was not reconsidered in banc. The appellate judgment in No. 78–1855 was not vacated by our order granting rehearing in banc in No. 77–1957.

2. Judges Holloway, Barrett, Doyle and Seymour voted to sustain the judgment originally entered by the panel majority in the Conclusion of the panel opinion. That judgment was vacated when rehearing in banc was granted but is re-entered, as stated below.

its motion to vacate the judgment and grant a new trial on the basis of newly discovered evidence and fraud (No. 78–1855).

Mrs. Malandris commenced this action against Merrill Lynch as the result of transactions between Mrs. Malandris' husband and an account executive of Merrill Lynch's Denver office, John Barron. The transactions were related to an account with Merrill Lynch which was solely in Mrs. Malandris' name and which transactions resulted in a loss of approximately $30,000 to the account.[1] Mrs. Malandris alleged that the actions of defendant constituted a violation of § 10(b) of the 1934 Securities Exchange Act, Rule 10b–5, § 22(a) of the 1933 Securities Act, various rules of the New York Stock Exchange, the National Association of Securities Dealers' Rules of Fair Practice and the Chicago Board of Options Exchange (CBOE), and of § 4–8–315(1) of the Colorado statutes, the state statute prohibiting wrongful transfer of securities.

In addition, Mrs. Malandris alleged that the actions constituted common law fraud, intentional infliction of emotional distress, conversion of her property, and breach of fiduciary duty. (II App. 26–41). Jurisdiction was asserted on federal question grounds as to the claims under the Securities Acts and regulations, and on diversity and pendent jurisdiction grounds as to the state law claims. Along with some other claims the claims of violations of the Securities Acts and regulations were withdrawn by the plaintiff before submission of the case to the jury, and only the claims of fraud, intentional infliction of emotional distress, and for punitive damages were submitted.

The jury returned a verdict of $1,030,000 in compensatory damages and $3,000,000 in punitive damages. Motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial were denied by a written Memorandum and Order of the trial judge discussing the issues raised and the evidence in detail. 447 F.Supp. 543. Defendant appeals from the judgment asserting, *inter alia,* that the evidence does not support an action for intentional infliction of emotional distress, that the trial court erred in refusing to grant a mistrial due to emotional outbursts at trial by Mr. and Mrs. Malandris, that all the damages are so excessive as to indicate that they resulted from passion and prejudice, that the award of punitive damages is unsupported by the evidence and barred by the Colorado one-year statute of limitations on actions for penalties and statutory liabilities, and that the punitive damage statute is unconstitutional as applied in this case. (Brief of Defendant 1–2).[2]

Defendant also moved the court to vacate the judgment and grant a new trial pursuant to F.R.Civ.P., 60(b)(2) and (3), alleging that defendant had newly discovered evidence of a material and controlling nature which established that the judgment "was procured as a result of the fraud and misrepresentations of plaintiff's husband, Steven Malandris." The motion was denied at the conclusion of a hearing before the trial judge. Defendant also appeals the denial of this motion, claiming an abuse of discretion and errors of law. (Brief of Defendant, 2).

I

## THE APPEAL FROM THE ORIGINAL JUDGMENT

A. *The claim of intentional infliction of emotional distress*

In considering the defendant's challenges to the damage awards we must heed the

---

1. Apparently $30,000 of the compensatory award was for the actual monetary loss of plaintiff, although this was not specified in the verdict for compensatory damages of $1,030,-000. This $30,000 element of the plaintiff's recovery is not specifically challenged in the defendant's briefs. Defendant does argue that the testimony of its account executive established that all of the transactions were properly authorized for Mrs. Malandris by her husband, but the jury implicitly rejected such a theory and we find that no grounds are shown to set aside the jury's resolution of this issue.

2. Separate briefs for each appeal have been filed by the parties. When discussing the issues in the separately numbered appeals our references will be to the particular briefs filed in the respective appeals.

restrictive rules governing appellate review after a jury verdict as outlined in *Tennant v. Peoria & Pekin Union Railway Co.,* 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520:

The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. *Washington & Georgetown R. Co. v. McDade,* 135 U.S. 554, 571, 572 [10 S.Ct. 1044, 1049, 34 L.Ed. 235]; *Tiller v. Atlantic Coast Line R. Co.,* supra, [318 U.S. 54] 68 [63 S.Ct. 444, 451, 87 L.Ed. 610]; *Bailey v. Central Vermont Ry.,* 319 U.S. 350, 353, 354 [63 S.Ct. 1062, 1064, 87 L.Ed. 1444]. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

■ We must view the evidence in the light most favorable to the party who prevailed before the jury and thus will discuss it in this manner. *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.,* 571 F.2d 1144, 1149 (10th Cir.), *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171. Erroneous admissions or exclusions of evidence and erroneous orders or rulings are not grounds for setting aside a verdict unless the error affects the substantial rights of the parties. *Id.* at 1149; *Harris v. Quinones,* 507 F.2d 533, 539, (10th Cir.). And, of course, since only claims based on state law were tried, Colorado law is controlling.

The tort known as intentional infliction of emotional distress was recognized by the Supreme Court of Colorado in *Rugg v. McCarty,* 173 Colo. 170, 476 P.2d 753, 756:

We recognize that an action in tort will lie to recover damages for severe emotional distress without any accompanying physical injury, subject to the limitations as set forth in Restatement (Second) of Torts § 46 (1965).

*See also Hansen v. Hansen,* 608 P.2d 364 (Colo.App.); *Meiter v. Cavanaugh,* 580 P.2d 399 (Colo.App.); *Enright v. Groves,* 560 P.2d 851 (Colo.App.). We will focus on § 46 of the Restatement of Torts (2d) because of the reliance on it by the Colorado Court. Section 46 provides:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

■ Thus, the four essential elements of such a claim are that (1) the conduct is extreme and outrageous; (2) the conduct is intentional or reckless; (3) the conduct causes emotional distress; and (4) the distress is severe. *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273 (3d Cir.). For the conduct to be considered extreme and outrageous, it must "go beyond all possible bounds of decency and ... be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Rugg v. McCarty,* supra 476 P.2d at 756 (quoting comment d to § 46).

The requisite intent is present where the actor desires to inflict severe emotional distress and knows that it is substantially certain to result from his conduct, or where he acts recklessly "in deliberate disregard of a high degree of probability that the emotional distress will follow." Restatement (Second) of Torts, § 46, comment i. The resulting distress must be extreme as opposed to trivial, in other words "so severe that no reasonable man could be expected to endure it." § 46, *supra*, comment j. Moreover, the distress must be "reasonable and justified under the circumstances." *Id.*

If the distress is exaggerated in comparison to that which a reasonable man would experience, there is no liability unless the defendant is aware of the plaintiff's peculiar susceptibility to emotional distress. *Id.,* comments f and j. The plaintiff's peculiar susceptibility to emotional distress thus both broadens and narrows the scope of the tort. It broadens the scope in that a jury may find the defendant's conduct to be outrageous in light of his knowledge of the plaintiff's peculiar susceptibility where it would not be so without such knowledge. *Id.,* comment f. Yet it narrows the scope in that without such knowledge, the defendant is not liable for exaggerated emotional distress. *Id.,* comment j.

Defendant makes three main arguments in asserting that a case of intentional infliction of emotional distress was not made out. First, it says that the elements of the tort were absent, that the tort consists of extreme and outrageous conduct which is intentional or reckless so as to cause severe emotional distress to another, and that its employee Barron did not have the requisite intent to harm Mrs. Malandris and his conduct was neither extreme nor outrageous. Contrary to most cases where a plaintiff was threatened, harassed, or abused, defendant asserts that here "the record establishes that defendant attempted to generate a profit for the Malandrises and that, as a result of advice which Barron gave them, they did make money by trading in options . . . and on several other occasions either realized profits or minimized the losses they would have otherwise incurred in other stock transactions." (Brief of Defendant, 19).

Second, defendant asserts that there was absolutely no direct contact between the plaintiff and Mr. Barron, that this claim would have to come within the class of cases in which conduct is directed at a third party, here the plaintiff's husband, with whom Mr. Barron conducted all of the stock transactions. Because the tort requires that the plaintiff be present at the time the wrongful conduct is directed at the third party, the action will not lie in this case. (Brief of Defendant, 15–20).

Third, defendant contends that recovery for intentional infliction of emotional distress is subject to clear limitations, one being that there is "no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge." (Brief of Defendant, 21). Defendant notes that Mrs. Malandris had a background of psychiatric problems and indeed suffered exaggerated emotional distress. Defendant says the evidence does not show that Mr. Barron was aware of Mrs. Malandris' "exaggerated susceptibility" to distress and hence defendant cannot be held liable. (Brief of Defendant, 21–22).

Last, defendant complains that the presentation of its defense was hampered by the trial court's exclusion of expert testimony designed to show the conservative nature of options trading and to rebut plaintiff's expert testimony as to the unsuitability of such transactions for a customer in plaintiff's position. Defendant says that the "unwarranted exclusion of such testimony on a material issue is reversible error," especially in a case like this where the "outrageous" nature of defendant's conduct resulted in an "astronomical" award of damages. (Brief of Defendant, 19–20).

In considering these contentions we now turn to the evidence. As noted above, the record is evaluated in the light most favorable to the plaintiff as the prevailing party under the jury's verdict.

The plaintiff's version of the events was presented largely through Steven Malandris, her husband. Mr. Malandris described himself and his wife as uneducated people, Mr. Malandris having quit school in the tenth grade because of his inability to keep up with his schoolwork. The school advised him to learn a manual trade and he joined the Army for this purpose but was unsuccessful in two attempts to learn various trades. He was finally able to obtain a high school equivalency degree after taking the test three times.

While stationed in Korea during his tour of duty, Mr. Malandris met and married the plaintiff. Mrs. Malandris is Korean and has never been to school. She can neither read nor write Korean or English. Her family was very poor. Mrs. Malandris was forced to leave home at the age of nine to work and help support her family. It was established that plaintiff was born on June 1, 1942 and Mr. Malandris was born on May 19, 1941. (VI App. Plaintiff's Ex. 84).

After marrying and coming to the United States, the couple adopted a spartan lifestyle, spending very little for anything other than basic necessities and doing nothing in the way of entertainment. Mr. Malandris obtained a job as a baggage handler for United Airlines, working almost every waking hour, including all major holidays. All of his earnings except that needed for bare essentials were put into a joint savings account.

Mr. Malandris first became interested in stock when he read about how much money he could make on United Airlines stock from a company bulletin board at work. He was concerned with financial security for his wife and the fact that manual labor did not offer security in the event of physical incapacity. Consequently, he decided to buy a thousand shares, which was later sold at a profit. The proceeds were redeposited in the savings account and Mr. Malandris was soon thereafter approached by various salesmen, offering him everything from vacuum cleaners to a chinchilla raising business. Mrs. Malandris began to recognize her husband's gullibility and insisted their savings be put into an account in her name alone. Mrs. Malandris thereafter controlled all of their money, giving her husband only enough money to pay bills or buy specific necessities.

In 1973 Mr. Malandris again decided that they should buy stock in United Airlines since it was his impression from the company billboard that even if the company went out of business, they couldn't lose money on the stock. He convinced his wife to agree to his plan and together the couple went to the banks and withdrew all of Mrs. Malandris' accounts. They then went to a brokerage house and purchased 2800 shares of United Airlines stock in Mrs. Malandris' name. (IV App. 347–48).

In the summer of 1973, plaintiff "had a feeling" that the stock should be sold and requested her husband to find a broker to sell it for her. She refused to return to the broker with whom she had previously dealt because he had embarrassed her by handing her an upside down newspaper to see if she could read. (*Id.*, 349). Mr. Malandris contacted the local Merrill Lynch office because it was apparent to him from Merrill Lynch's advertising that "[o]ther companies get the leftovers and Merrill Lynch gets the top people." (*Id.*, 350).

After calling the Denver office of Merrill Lynch, Mr. Malandris asked to speak to someone who "handles just air-line stock" and was put through to a Mr. Barron, a retired military man who became a registered broker in February of 1973, four or five months prior to meeting Mr. Malandris. (V App. 621). The two talked briefly on the phone and then met at defendant's office later that same day. (IV App. 351–53). It was at that meeting that Mr. Malandris discussed opening an account in his wife's name alone:

Q. Did you ask them about opening an account in your wife's name only?

A. Yes, and he wanted to know why, you know, what's the reason for this. And I told them—there is only like one kind of business, the wife wanted the stock sold and put it back into the bank, and then he asked me, "Do

you agree with that?" And I said, "It doesn't matter whether I agree or not. The wife—it's the wife's money, the wife's stock, and it's her decision," and then he wanted to know more about the wife.

Q. What did you tell him?

A. I told him like, you know, she is a Korean woman, and I didn't—and she is—and she really feels insecure and how she says I am a very gullible person, and then he says, "That's— you know how gullible get taken advantage of, taken in by certain people, but not this company. A good thing—if I had gone to another company, I have to worry but not to worry here.... And your wife wants the account in her name," and then I told him about the banks and then he laughed and he says, "Your wife," he said, "Being she is so uneducated I won't be mad at her for this idea, but putting money in the bank but," he said, "Would you believe, there are college graduate people putting money in banks. What do you think the banks do, hold the money? You go to a bank someday and you ask them how much have you got on deposit in this bank, and they will say, add all your customer's accounts up, and say 5,000,000 and ask you whether this $5,000,000 is right here in the bank in the ground. No, they will tell you it's in the New York Stock Exchange. They are taking the dumb monies people, even though they are dumb, taking that money and giving the people little money, and they are putting it in the stock market and making money off people. That's all that banks do. They are making money off people," and I said, "Well the wife wants it in the bank because it's safe, and it's her future. I understand the stock market is not safe," and he said, "Well, you know nothing about the stock market," and I said, "No." (*Id.*, 353–54).

Mr. Malandris testified that he informed Mr. Barron in subsequent meetings that he was a baggage handler, that the couple had no other stock nor savings, that the couple never went out, that Mr. Malandris wore his work uniform all the time to save on clothing and laundry expenses, and that he never bought meals at work. (*Id.*, 356).

Mr. Barron subsequently opened an account in Mrs. Malandris' name, indicating on the new account information form that she was referred by Tom Travers, a United Airlines pilot, that she had previous investment experience, that Mr. Malandris was a mechanic with an annual income of $22,000, and that she had a net worth of $100,000. (VI App. 955). The account was opened and all transactions took place without Mr. Barron ever consulting the plaintiff. (V App. 625). Mr. Malandris denied telling Mr. Barron that he was a mechanic, that he was referred by Tom Travers, or that either he or his wife had a net worth of $100,000. (IV App. 397–98). Mr. Travers also denied knowing either Mr. or Mrs. Malandris and denied referring either one to Mr. Barron. (III App. 129–30).

After the account was opened the plaintiff changed her mind about selling the stock but did agree to allow the stock certificates to be deposited at Merrill Lynch for safekeeping. Mr. Malandris testified that Mr. Barron thereafter advised Mr. Malandris that due to a decline in price, the stock should be sold without consulting the plaintiff, stating:

"What does she know. You told me she doesn't know anything about it, do you want to be looking out for her. You are really thinking about her future or aren't you worrying about her future? ... You already told me she doesn't understand what is happening, and she doesn't know a darn thing, and you don't sound like you know nothing about it either. Trust me. I am in this, and I know what is happening." (IV App. 361).

The stock was sold and when Mr. Malandris informed plaintiff of the sale, she became very upset, accusing him of having the account in his name and of lying to her.

Mr. Malandris promised to deposit the proceeds of the sale in a savings account as soon as they became available. (*Id.,* 362–64).

However, Mr. Malandris testified that when he went to pick up the proceeds, Barron began talking to him about the options market,[3] which had begun in April of 1973 and with which Barron had no prior experience. Mr. Barron did not talk in terms of options but as "an opportunity to go in partnership with Merrill Lynch," and Mr. Malandris said Barron told him (IV App. 366–69):

"You know, Merrill Lynch doesnt take chances, and banks don't take chances, and this is only given to really top people, people fight with it, but I feel sorry for you and your wife. Nobody probably has ever given you this opportunity before.... What it consists of, it's guaranteed first off ... What are you concerned with? Why are you putting the money back in the bank? Why does your wife want the money in the bank? ... [T]his is guaranteed, and you are going to get 20 percent interest."

Mr. Malandris said he was not given the required prospectus on the options exchange until much later, and then with the explanation that even though Mr. Barron was required to give him the prospectus, Mr. Malandris would not understand the material in the book and Mr. Barron really couldn't see any use in giving him the book. (*Id.,* 385). To take advantage of the opportunity, of options transactions, Barron decided plaintiff's account should be switched from a straight cash account to a margin account,[4] although he did not use that term with Mr. Malandris. He explained only that Mrs. Malandris would need to put up 50 percent of the partnership money and in order "to make her 50 percent even to Merrill Lynch's 50 percent she would have to borrow some kind of money that defendant was going to loan her." (*Id.,* 370). Barron repeatedly emphasized that this "partnership" did not involve the stock market but rather the "banking department of Merrill Lynch." (*Id.,* 371). When Mr. Malandris said he would discuss the proposition with his wife, Barron told him:

"I have never met your wife. I have never seen your wife. I have never talked to your wife. You are telling me your wife has never been to school. Doesn't know anything. What are you going to talk to her about? It's like talking to the wall." (*Id.,* 373).

Mr. Malandris testified that he finally agreed not to consult his wife and then signed some papers as directed by Mr. Barron. Mr. Barron also told him he needed Mrs. Malandris' signature on a document later determined to be a power of attorney

---

**3.** "Options" transactions were described in the testimony as transactions which involve the purchaser of the option paying a certain amount of money for the right to purchase a security at a stated price for a certain time. Correspondingly the seller agrees to sell the security at the agreed price during that time if the purchaser decides to exercise his option. (III App. 312).

**4.** In the testimony, a margin account was defined as one in which the customer borrows money from the broker in order to buy more stock, with the customer's stock being held as collateral for the loan. The brokerage firm makes money on a margin account in two ways. First, it charges interest on the loan at a higher rate than what it must pay to borrow the funds itself. Second, because the customer has increased purchasing power with the borrowed funds, he purchases more stock than he would in a straight cash account and thus the broker is earning more commissions. (III App. 301–03).

Most brokerage firms require the equity (*i.e.,* the difference between the market values of the securities and the amount of the debt for the loan) in the account to be no less than 25 percent of the market value of the stock held by the account. This 25 percent (or any higher percentage set by the brokerage firm) is known as the maintenance margin. Should the equity in the account drop below the maintenance margin, the broker demands that the customer deposit additional funds or additional stocks. If the customer is unable to do either of these things, the broker will begin liquidating the collateral by selling the customer's stock. (*Id.*).

To switch an account from straight cash to margin requires a customer's authorization evidenced by his signature on a hypothecation card. Defendant failed to produce any evidence at trial that such a card was signed by plaintiff. (V App. 577–78).

(authorizing Mr. Malandris to act on his wife's behalf) and, when informed that Mrs. Malandris would not sign since she believed her money was in the bank, Mr. Malandris said that Barron told him to sign her name for her. (*Id.*, 374–76).[4a] Mr. Malandris acquiesced in the "partnership" for awhile, even bringing more money to Barron after telling his wife that he was using the money to pay off bills resulting from his mother's illness and from bringing his wife's relatives to America. (*Id.*, 378–79).

Difficulty with the margin account developed when the New York office returned some of the forged documents requesting new signatures by Mrs. Malandris. When Mr. Barron insisted that Mr. Malandris sign his wife's name again, Mr. Malandris began to worry that his wife would find out the money was not in the bank. He told Barron that he wanted to end the "partnership" and sought the return of his wife's stock. At this point Mr. Malandris said that Mr. Barron threatened him with jail, saying:

> "You knew this was your wife's account only. You had no authority to be doing it. . . . You said your wife is dumb, let's use that. . . . And she has never worked. Who will take care of your wife when you go to jail? (*Id.*, 381).

Finally Mr. Malandris said that he again forged his wife's name to the papers, assured by Mr. Barron that there was nothing to worry about, the papers were simply paperwork and "everything is guaranteed." (*Id.*, 383).

Subsequently Mr. Malandris overheard a group of pilots at work discussing the options exchange and learned for the first time that there was a considerable risk involved. He then angrily called Mr. Barron who responded that the pilots didn't know what they were talking about and that everything was guaranteed or otherwise Merrill Lynch would not invest its own money. Mr. Malandris said he believed and trusted Barron again. (*Id.*, 386–88).

Near the end of 1973 Barron called Mr. Malandris and unexpectedly demanded immediate delivery of $42,000, apparently to cover the amount loaned to the account by defendant. Malandris said that Barron informed him that unless he delivered the money, defendant would "completely end the partnership" and sell everything in the account, (*id.*, 389–90), that Barron then tried to convince him that even though the account represented "everything the wife had", the amount of money lost in the account was "really nothing" (*Id.*, 390–91):

> That's nothing. There are some people who in a matter of days lose half a million dollars. This is just giving you a taste of what the market is.

Malandris testified that Barron then suggested a new investment to recoup the loss without Mrs. Malandris learning of the loss. He stated that he would purchase Pennzoil stock and make back all the money that had been lost. Mr. Malandris refused to agree and instead told Barron to sell whatever was left in the account and he would "give back the wife her money, whatever is left." (*Id.*) Mr. Malandris subsequently picked up a check for $33,300 dated December 27, 1973, and a subsequent check for $517.24. (*Id.*).[4b]

---

**4a.** When Mr. Malandris decided to trade in options, he signed margin agreements and a put and call agreement in his own name. (VI A.956–58). When these were returned from New York, he signed his wife's name to a new put and call agreement. (*Id.* at 960).

**4b.** In options and Northwest Airlines transactions there was an overall net loss of approximately $30,000 to the Malandris account. There was a gain of approximately $14,000 on the sale of options, which fund was applied on the purchase of 4600 shares of Northwest Airlines stock, and a loss of approximately $44,000 on the sale of Northwest Airlines stock. Defendant maintains that the Northwest Airlines stock sale was Mr. Malandris' decision, as Barron testified. (Brief of Defendant 10–11). The plaintiff says the sale followed a demand by Barron for $42,000 in connection with the margin account, and that the proceeds were then used to repay defendant its margin loan. (Brief of Plaintiff 26). On the basis of Mr. Malandris' testimony, the conclusion could have been drawn by the jury that Barron knew the power of attorney was forged and that Mr. Malandris had no right to direct a sale of the Northwest Airlines stock.

After picking up the checks, Mr. Malandris said that he talked by phone with Barron who warned him that it would be to Mr. Malandris' advantage to "keep quiet on the whole thing," not to tell anyone, and not to talk to a lawyer. (*Id.*, 392).

Mr. Malandris subsequently told his wife of the loss of her money. He described her having initial reactions of disbelief and then anger, first refusing to believe that the money was not safely in the bank, and then becoming angry that her husband had stood by and let people steal her money. (*Id.*, 444) Mrs. Malandris has, according to her husband, undergone a marked change since learning of the loss. She no longer wants to have children, she is prejudiced "against white people who wear suits," and is "wrapped up in . . . religion," spending most of her time listening to religious programs on the radio. (*Id.*, 398).

Mr. Malandris sought help from several people in recovering his wife's money, including his senator, the Securities and Exchange Commission, the New York Stock Exchange, and defendant. (*Id.*, 393–94, 401). His attempt to seek the assistance of the Securities and Exchange Commission and his displeasure in not receiving assistance led him to be considered as a suspect in a bombing at the Denver SEC office. As a result, the FBI searched the Malandrises' home, leading Mrs. Malandris to believe that defendant and the government were in "cahoots" and that defendant had caused the FBI to conduct the search. (*Id.*, 478).

It is true that Mr. Barron directly and vigorously contradicted almost all of Mr. Malandris' version of the transactions. Among other things Barron testified that he did not have Mr. Malandris forge his wife's power of attorney, that all the transactions were authorized by Mr. Malandris for his wife, and that he did not promise any "partnership" with defendant. Barron maintained that Mr. Malandris was knowledgeable about the types of transactions undertaken, that Mr. Malandris was the one to first express interest in options trading, that Barron fully explained the risks of such trading, and that it was Mr. Malandris who had been interested in airline stock and decided to buy Northwest Airline stock.

Two psychiatrists testified concerning their assessment of Mrs. Malandris' present mental state and the causes of her condition. One of them, Dr. Grey, had seen Mrs. Malandris in 1972 as a result of her inability to conceive. He described her as being depressed in 1972 over problems with her sisters and with her inability to become pregnant but said that she was able to function quite well in her role as a housewife. (*Id.*, 489). However, in November 1975 when he saw her again she was plaintive, crying, unable to control herself, nonfunctioning and "almost paralyzed in her depression, in her religious mania," what he would call "dead to the earth, dead to this life . . . ." (*Id.* at 491, 497). From his six examinations of Mrs. Malandris in 1975, 1976 and 1977 Dr. Grey attributed her change to the loss of her money "because the money was all the security that she had." (*Id.*, 493). It was his opinion that her condition appears to be permanent and he doubted and questioned how she could come out of it. (*Id.*)

Dr. Frey, a psychiatrist who examined Mrs. Malandris on behalf of the defendant, was of the opinion that she had a "depressive neurosis" and described her as becoming "increasingly sad, upset, depressed, [and] tearful over this great loss." (*Id.*,

---

A brief outline of the Malandris account transactions from Mr. Mandell's testimony (III A.303–05) and the exhibits is as follows:

In late September of 1973, 2800 shares of United Airlines stock were sold, generating $57,400 in proceeds. Thereafter, 50 shares of Winter Park Telephone Stock were sold, generating $730 in proceeds and an additional $3,900 was deposited by Mr. Malandris in the account. Forty options calls on Northwest Airline stock were written generating $19,000 in proceeds and almost simultaneously, the account purchased 4,000 shares of Northwest Airline stock, followed less than two weeks later by a purchase of an additional 500 shares of Northwest stock. Consequently, in early October, the account included $118,000 worth of Northwest Airline stock which was purchased from the $78,000 worth of the client's funds (including proceeds from the option sales) and $40,000 borrowed from Merrill Lynch. (See Plaintiff's Exhibit 1).

477, 513). In addition, she felt humiliated and felt "a terrible loss of face" by having details of her background and personal life divulged in the presence of many strangers as a result of the instant lawsuit. (*Id.*, 479). As a result of her feelings, Dr. Frey explained that Mrs. Malandris had increasingly turned to religion for solace. (*Id.*, 480).

Dr. Frey agreed with Dr. Grey that Mrs. Malandris' early deprivations made her more vulnerable to the subsequent loss of security she felt when she lost her money. (*Id.*, 492; V App. 548). Dr. Frey diagnosed Mrs. Malandris as having a "depressive neurosis" attributed to three major losses stemming from the Merrill Lynch transactions: "the actual loss of money, the very, very important loss of control, which was essential to her over Mr. Malandris and a very important loss of face." 513–19. Dr. Frey believed that antidepressant medication would be "[v]ery, very effective in lifting and in easing and in dealing with the picture of depression," (V App. 522), and that with other medication and psychotherapy there was a very high likelihood of significantly helping a person such as Mrs. Malandris. He said that some mental health center treatment of this sort would not necessarily have to be extended over years and years, although work with individual therapists once or twice a week could take a matter of years. (*Id.* at 529, 535, 573).

■ We conclude that the evidence was sufficient to enable the jury to find liability for intentional infliction of emotional distress. Even if Mr. Barron did not intend to inflict severe emotional distress, the evidence would support inferences that such distress was "certain, or substantially certain, to result from his conduct," *see* Restatement, Second of Torts, § 46, comment i, and that Barron knew from the beginning of these transactions that the plaintiff was very concerned with financial security and wanted her money in a savings account; that even if his actions had not resulted in a loss, Mr. Barron should have reasonably foreseen that there was a "high degree of probability that the emotional distress" would occur when plaintiff learned that her instructions had not been followed. *Id.* "... [R]eckless conduct causing emotional distress renders an actor as liable as if he had acted intentionally. *See* comment i to § 46." *Chuy v. Philadelphia Eagles Football Club, supra,* 595 F.2d at 1275.

We cannot accept defendant's contention that the conduct could not be found to be outrageous. There was evidence that Mr. Barron avoided consulting the plaintiff before making unauthorized transactions in her account, knowing that such transactions were directly contrary to her wishes; that he convinced her husband to misrepresent the facts to her and used Mr. Malandris as a pawn, knowing that the plaintiff insisted on having the account in her name alone because of her husband's gullibility; that Barron continued to suggest high-risk investment decisions to Mr. Malandris, knowing the plaintiff was very concerned with financial security; and that even when the account showed a $30,000 loss, Barron persisted in trying to conduct other transactions with what remained of plaintiff's savings.

In light of such evidence, we feel the trial court was not in error in submitting the issue to the jury. It is true that the evidence was sharply conflicting as noted, with Mr. Malandris' account being almost entirely contradicted by Mr. Barron's testimony. However, these conflicts in testimony were issues of fact to be resolved by the jury. *Boehm v. Fox,* 473 F.2d 445, 447 (10th Cir.); *Jaeco Pump Co. v. Inject-O-Meter Manufacturing Co.,* 467 F.2d 317 (10th Cir.). The jurors are the exclusive judges of the credibility and weight to be given to the testimony of any witness. *Boehm v. Fox, supra; United States v. Plemons,* 455 F.2d 243 (10th Cir.). *See DeCicco v. Trinidad Area Health Ass'n,* 40 Colo.App. 63, 573 P.2d 559, 562 (quoting Section 46, comment h: "where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.").

We cannot agree with the defendant that the absence of direct contact between Barron and the plaintiff precludes liability in these rather unusual circumstances, or that the record compels a finding that the conduct was directed at Mr. Malandris so that only subsection 2 of § 46 may apply. Barron's conduct involved funds which belonged to the plaintiff, as he knew, and which were in an account in her name alone. The evidence that he used the plaintiff's husband to gain control of the money does not establish that his conduct was directed solely at Mr. Malandris.

The sufficiency of the evidence in this respect is supported by the examples discussed under § 46. Moreover, in *Chuy v. Philadelphia Eagles Football Club, supra,* liability was found where a football team physician made a statement to the press that plaintiff, a member of the team, was suffering from a potentially fatal disease. Plaintiff, after reading the statement, became very upset and depressed. Even though plaintiff had had prior contact with the team physician, the conduct upon which liability was based was not between plaintiff and the doctor, but between the doctor and a third party. The absence of the plaintiff during the tortious conduct was irrelevant in that case just as it is here. In both situations the plaintiff was the party most likely to suffer emotional distress upon learning of the defendant's actions. *See* § 46, illustrations 15 and 16.

We agree with defendant that plaintiff's reaction to Barron's conduct was somewhat extreme, although the sudden realization that half of one's savings was gone could be expected to cause even the most stable individual great distress. We cannot agree that, as a matter of law, the evidence was wholly insufficient for the jury to find defendant liable for the injury to the plaintiff. There was evidence that Barron was advised that plaintiff was an insecure, illiterate Korean woman; that she was so concerned with financial security that she refused to allow her husband any control over their finances; that Barron knew of the couple's frugal lifestyle, denying themselves even the simplest pleasures in order to save money; and that Barron knew that he was dealing with all the savings the plaintiff had. (IV A. 353–56). It was a permissible inference that Barron could reasonably anticipate an exaggerated reaction to the loss of the savings which plaintiff valued so highly. We do not feel it necessary that Barron know specifically of Mrs. Malandris' previous depression or that she had previously been referred to a psychiatrist. *See* Restatement, Second of Torts § 46, comment f and illustrations 9–13.

As to defendant's contention that its expert testimony was improperly excluded, we find no reversible error. The question of the simplicity of options trading was raised by defendant on cross-examination of plaintiff's expert witness, as defendant's citation to the record shows. (*See* Brief of Defendant at 20; III App. 309–10).[5] The court rejected defendant's subsequent attempts to introduce evidence as to the simplistic and conservative nature of options trading, reasoning that it was irrelevant and also stating:

> What I am saying, given the counts as they are, a simplified explanation of these accounts, this kind of trading, to the jury is prejudicial and unfair to the testimony. It's not what some expert can explain. It's what Barron knew and what Malandris knew. (VI App. 811; *see* VI App. 773–76, 799–800).

While we have some concern about this ruling, we cannot say that the trial court abused its discretion in excluding the evidence. The court explained in its order denying defendant's motions for judgment notwithstanding the verdict and for a new trial, that such testimony could mislead and misdirect the jury as to the issues in the

---

5. Plaintiff asserts that a question during the course of cross examination was erroneously attributed to plaintiff's counsel. (Brief of Plaintiff, 42). The question in issue asked the witness to explain whether the concept of writing call options is a simple concept. Whether or not plaintiff's counsel asked for this explanation is irrelevant since the previous question by defense counsel had raised the same question. (III R. 310).

case. 447 F.Supp. at 547. We cannot hold that it was an abuse of discretion to exclude the evidence. *See* F.R.Evid. 403; Weinstein's Evidence, ¶ 403[04].

In sum, we are persuaded that the evidence was sufficient to go to the jury on the claim of intentional infliction of severe emotional distress and to justify a compensatory damage award on that basis.

## B. *The fraud claim*

■ Defendant argues that an award of damages for emotional distress was also improper on the claim of common law fraud. Defendant says that such damages are allowed only where the injury could have been reasonably anticipated to be a natural and probable consequence of defendant's conduct, and not where the underlying tort is a "business fraud." Additionally defendant contends that because such damages were not recoverable in a fraud action, special verdicts should have been submitted to the jury to determine whether the jury found liability for emotional distress based on the tort of intentional infliction of emotional distress or on the theory of common law fraud. Since this request was denied, it is impossible to tell which of the two theories of liability was found by the jury and therefore the general verdict must be set aside. (Brief of Defendant, 22–25).

In *Valley Development Co. v. Weeks,* 364 P.2d 730, 733 (Colo.), the Colorado Court stated:

> [U]nder ordinary circumstances there can be no recovery in tort for mental anguish suffered by a plaintiff in connection with an injury to his property, either real or personal. *Where, however, the act occasioning the injury to property was inspired by fraud, malice, or like motives, mental suffering is often held to be a proper element of damage.*

*See also McNeill v. Allen,* 534 P.2d 813, 819 (Colo.App.).

We thus are not persuaded by defendant's assertions that the award of damages for mental distress was improper under a fraud theory. Whether based on the principle of recovery for intentional infliction of emotional distress or for fraud, we conclude that the verdict for compensatory damages should not be disturbed when the evidence in the record is considered as a whole and favorably to the prevailing party, as we must.

## C. *The claim of excessiveness of the compensatory damages award*

Defendant vigorously challenges the amount of the verdict as to both compensatory and punitive damages, alleging that it is so grossly excessive that it must have resulted from passion or prejudice. Defendant argues that "[d]espite an out-of-pocket loss of only $30,000, the jury awarded plaintiff damages of $4,030,000, or approximately 134 times the actual financial loss incurred." (Brief of Defendant, 31). The defendant also specifically attacks both the compensatory award of $1,030,000 and the $3,000,000 punitive award as wholly unjustified. We will consider the compensatory award now and will later treat the claim of excessiveness of the punitive damages award.

Defendant contends that the amount of the compensatory award is clearly disproportionate to the injuries sustained, that the highest award of compensatory damages for emotional distress ever previously allowed by a Colorado court is $30,000 awarded in *DeCicco v. Trinidad Health Ass'n,* 573 P.2d 559 (Colo.App.), and that no jurisdiction has upheld an award of more than $60,000 in the absence of physical injury or death. (*Id.,* 33). According to defendant, the evidence even viewed in the light most favorable to plaintiff does not support the compensatory damages. Defendant points out that plaintiff was suffering from mental problems before the alleged tort occurred and that there were other causes for the subsequent emotional distress plaintiff suffered after the loss of her money.

Defendant further says that the FBI search of plaintiff's home after the bombing of the Denver SEC office was a major cause of plaintiff's mental problems and that defendant clearly was not responsible

for this search. (*Id.*, 34–35). Defendant also contends that the punitive award bears no rational relationship to the alleged injury, noting it is three times the maximum fine permitted under federal law for a criminal act, which is an indication that "the verdict was dictated by emotion, and not by any reasoned consideration of the evidence." (*Id.*, 35–36).

We have said that absent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate.[5a] *Metcalfe v. Atchison, Topeka and Santa Fe Railway Co.*, 491 F.2d 892, 898 (10th Cir.); *Ketchum v. Nall*, 425 F.2d 242 (10th Cir.); *see Hudson v. Smith*, 618 F.2d 642, 646 (10th Cir.); *Colorado Coal Furnace Distributors, Inc. v. Prill Manufacturing Co.*, 605 F.2d 499 (10th Cir.). Such bias, prejudice or passion can be inferred from excessiveness. *Wells v. Colorado College*, 478 F.2d 158, 162 (10th Cir.); *Earl W. Baker & Co. v. Lagaly*, 144 F.2d 344, 347 (10th Cir.). However, a verdict will not be set aside on this basis unless it is so plainly excessive as to suggest that it was the product of such passion or prejudice on the part of the jury. *Wells v. Colorado College, supra; see Snowden v. Matthews*, 160 F.2d 130, 131 (10th Cir.).

Such cases recognize the principle that if the court determines that the verdict was the result of passion or prejudice, or for any other reason it appears that the jury erred or abused its discretion not only on the issue of damages but also on the issue of liability, the court must unconditionally order a new trial and cannot give the plaintiff the option to accept a lesser amount. 6A Moore's Federal Practice ¶ 59.05[3], pp. 59–59, 59–67 and 59–68; *Minneapolis St. Paul and Sault Ste. Marie Ry. Co. v. Moquin*, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243, 521–22; *see Curtis Publishing Co. v. Butts*, 388 U.S. 130, 160, 87 S.Ct. 1975, 1994, 18 L.Ed.2d 1094.

However, another remedy is also recognized. Where the court concludes there was error only in an excessive damage award, but not one also tainting the finding of liability, the appellate court may order a remittitur and alternatively direct a new trial if the plaintiff refuses to accept the remittitur, a widely recognized remedy. *See Holmes v. Wack*, 464 F.2d 86, 89 and n. 3 (10th Cir.) (citing *Botsford v. Ideal Trucking Co.*, 417 F.2d 681 (2d Cir.) as illustrating a "remittitur ordered by appellate court"); *Minker v. St. Louis-S.F. Ry. Co.*, 574 F.2d 1056, 1060 (10th Cir.) (discussing the claim of an excessive verdict but stating that the appellate court was not "inclined to order a remittitur" in that case); *Stapleton v. Kawasaki Heavy Industries, Ltd.*, 608 F.2d 571, 574 n. 7, *modified*, 612 F.2d 905 (5th Cir.); *Curtis Publishing Co. v. Butts*, 351 F.2d 702, 717–19 (5th Cir.), *aff'd.* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094; *Lanfranconi v. Tidewater Oil Co.*, 376 F.2d 91, 96–97 (2d Cir.), *cert. denied*, 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (conditional remittitur of a portion of a punitive award); *Covey Gas & Oil Co. v. Checketts*, 187 F.2d 561, 563 (9th Cir.); 11 Wright and Miller, Federal Practice and Procedure, § 2820, pp. 133–35; 6A Moore's Federal Practice ¶ 59.-05[3], pp. 59–67—59–68. *Cf. Bankers Life & Casualty Company v. Kirtley*, 307 F.2d 418, 426 (8th Cir.). And *see Kresse v. Bennett*, 379 P.2d 807, 808 (Colo.) (conditional remittitur of a portion of exemplary damages).

For reasons explained below, we do not disturb the compensatory award here but must agree that the punitive damage award was excessive. However, we do not feel that the verdict was the result of passion or prejudice so that the determination of liability is tainted; and since we conclude that there is only error in the size of the punitive award, the remedy of remittitur is appropriate. Especially in a case like this involving a claim of outrageous conduct, it is not a jury's duty to set aside, even if it

---

**5a.** We have not treated these statements as a bar to remittitur in all cases. *See, e.g., R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749 (10th Cir.) (jury verdict reduced by amount of double recovery).

were possible, "all the decencies of human emotion when called upon to decide controversy," although it is their duty "not to allow emotion to overcome fact, not to allow sympathy to overcome reason, not to allow desire for result to overcome justice." *Barnes v. Smith,* 305 F.2d 226, 229 (10th Cir.). In this case we conclude that excessiveness of the punitive award does not demonstrate that the liability determination was tainted. We are convinced that the remedy of remittitur is proper and fair, and that ordering a new trial because of the size of the punitive award would be unfair to the plaintiff since we are persuaded that only the size of that award was error requiring relief.

 With these standards in mind, we turn first to the defendant's challenges to the compensatory award. We are not persuaded by defendant's reasoning that the overall verdict is excessive because it is 134 times the amount of the "actual financial loss." There is no requirement that the award for mental distress bear any relationship to the financial loss incurred as a result of the tortious acts. Indeed, actions for intentional infliction of emotional distress are often brought against creditors by plaintiff-debtors, a situation in which the plaintiff often has suffered no financial loss. *See* Prosser, Handbook on the Law of Torts, § 12 at 57 (4th Edit.). We also note that while the loss of $30,000 is much the smaller item, it represented the loss of one-half of the couple's savings. Hence the relevant inquiry is whether the compensatory award was excessive in relation to the injury—an injury consisting of the emotional distress suffered by the plaintiff and its long-range effects on her, as well as the financial loss.[6]

It is true that here there was evidence that prior to the loss of her money plaintiff had experienced emotional difficulties and had been examined by a psychiatrist in 1972 in relation to her inability to become pregnant. The psychiatrist who had seen her in 1972 described her condition then as depression due to problems with her two sisters. (IV App. 489). And while the trial court characterized plaintiff's condition as the "tragedy of a lost life," we note that there was no evidence that plaintiff requires hospitalization or someone in the home to care for her physical needs. Apparently she is able to function to this extent.

Nevertheless, before the impact of these transactions in the latter part of 1973, plaintiff was able to function quite well as a housewife. She was 31 years of age and had a well-ordered, though frugal, marriage relationship. In contrast, after the disastrous 1973 transactions, plaintiff by 1975 had become almost paralyzed in her depression and in her religious mania, according to Dr. Grey:

> I observed that she became almost like paralyzed in her depression, in her religious mania, and she became really, what I would call, she became dead to the earth, dead to this life, because everything was "I don't care," and giving up, you see, totally, her interest now, and that affected, you know, all the relationships which she had towards the husband, towards her own family.

> And the contact which has been so close before to the family, now it's practically nonexistent, and nothing is really important for her. (IV App. 491).

The psychiatrist felt that plaintiff's condition had adversely affected her marital life and appeared to be permanent. As to the cause of the changes in her condition, he said the only possible cause was the financial loss which totally undermined her security. (IV App. 492–93).

As noted, Dr. Frey, who examined the plaintiff for the defendant, was of the opinion that she had a "depressive neurosis." He attributed plaintiff's condition to three causes: the loss of the money, the loss of plaintiff's control over her husband's actions, and the humiliation resulting from an FBI search of her home. (V App. 515).

---

**6.** Defendant apparently does not challenge the reasonableness of the $30,000 portion of the verdict, arguing only that the $1 million award for mental distress and the $3 million award of punitive damages are excessive.

Although defendant argues that this testimony established that the FBI search was a primary cause of plaintiff's condition, we note that Dr. Grey's testimony indicated that the loss of her money was the sole cause. Hence the jury was entitled to determine that the impact of the transactions alone caused the plaintiff's condition.

There was sufficient evidence to support the inference that before the impact of the transactions with defendant, plaintiff functioned well in her admittedly limited world and took an interest in her home, her husband, her sisters and in her hope to have children, and that since this episode, these interests have ceased and plaintiff has withdrawn to the point that religion is her only interest. With respect to the evidence on causation and plaintiff's condition, we are persuaded by the cogent observations of the trial judge who saw and heard the plaintiff and all the evidence. These views were expressed in his order denying post-trial motions (447 F.Supp. at 545–46):

> *The evidence also shows, beyond doubt, that Jung Ja Malandris has sustained permanent emotional injury which has destroyed her ability to function as a human being.* She has rejected this world and lives only in the anticipation of life after death. This results in her total preoccupation with religion.

The defendant urges that the verdicts be set aside because they are "so grossly excessive as to shock the judicial conscience." What is most relevant in this case is not the judicial conscience, it is the conscience of the community as represented by the six people who served on this trial jury. They heard this evidence and they considered whether the conduct of John Barron went beyond the bounds of decency and was utterly intolerable in a civilized community. The defendant's counsel wish to make much of the fact that there was only a $30,000.00 economic loss. They, like their client, fail to understand that such economic losses can and do result in human suffering which cannot be evaluated arithmetically. This is not a case of a lost investment, it is the tragedy of a lost life. Is $1,000,000.00 too great a value to place upon that life?

The defendant denies that there is any showing of proximate causation between its acts and plaintiff's emotional state. The jury was correctly instructed as follows:

> Proximate cause means that cause which in natural and probable sequence produced the claimed injury. It is the cause without which the claimed injury would not have been sustained. *See* C.J.I. § 9:24.

The evidence shows that Jung Ja Malandris did have a predisposition to suffer severe emotional injury from any economic loss and the psychiatric testimony that she was greatly affected by the loss of control of her husband is an important aspect in this case. That loss of control was a consequence of the defendant's interference in this couple's relationship. It is apparent to me, as it must have been to the jury, that, knowing that which he did know about the plaintiff, John Barron should be held to know that a reasonably foreseeable consequence of the manipulation of Steven Malandris and the deceit of his wife would be the collapse of her ability to function. The defense has pointed out that there were other factors contributing to plaintiff's emotional condition. Yet, it failed to produce any evidence which would separate the effects of its wrongful conduct from the effects of other influences. The law in Colorado is clear that the aggravation of a pre-existing condition can result in liability if the wrongdoer is unable to isolate the impact. *Stephens v. Koch, Colo.,* 561 P.2d 333 (1977); *Intermill v. Heumesser,* 154 Colo. 496, 391 P.2d 684 (1964). (Emphasis added).

 We cannot reject the conclusion of the trial judge that the jury's award of compensatory damages was justified. Considering the whole of the evidence, including the plaintiff's condition before and after the impact of the transactions, her age, the medical testimony of present and permanent mental injury to the plaintiff, and the jury's opportunity to observe Mr. and

Mrs. Malandris' testimony and her emotional appearance on the stand, we are satisfied that the compensatory award itself is not so plainly excessive that we should infer that it was the product of passion or prejudice or hold that it is shocking to the conscience of the court.

### D. *The punitive damages award*

Defendant presses these principal arguments in objecting to the award of punitive damages.[7] First, it argues 'that the evidence is insufficient to allow imposition of punitive damages against it as the corporate employer of Mr. Barron, even assuming a sufficient showing to allow punitive damages against Barron himself. Secondly, defendant asserts that the punitive damages claim was barred by the Colorado one year statute of limitations imposed on actions to recover any penalty or forfeiture under any penal statute. Third, defendant says that the Colorado punitive damages statute, as applied in this case, violates the federal Due Process and Equal Protection Clauses and the Colorado Due Process Clause. Lastly, defendant strongly argues that the punitive award of $3,000,000.00 is grossly excessive in any event.

It is convenient to discuss the arguments on the statute of limitations and the constitutional questions first, and then the remaining questions which both require consideration of the evidence pertaining to the punitive award.

(1) *The one-year statute of limitations*

The defendant argues that the plaintiff's claim for punitive damages is barred by the statute of limitations provided by § 13–80–104 Colo.Rev.Stat. (1973).[8] This is a special statute providing that all actions for any penalty or forfeiture on any penal statute must be brought within one year. The Colorado courts and the federal district judges in Colorado are divided on the applicability of the statute to claims for punitive damages.[9] The latest opinion in Colorado is *Jones v. Harding Glass Co.,* 619 P.2d 777 (Colo.App., July 3, 1980), which held the one-year statute inapplicable in such circumstances, one Judge dissenting. The Supreme Court of Colorado granted certiorari to review that decision on November 28, 1980.

The plaintiff responds that the argument based on the one year statute is raised for the first time on appeal, that defendant's failure to assert the issue at trial constituted a waiver, that the general statement of an affirmative defense that plaintiff's claims are barred by the "applicable statutes of limitations" was not sufficient notice to preserve the defense, and that defendant made no motion concerning the defense to the trial court. On the merits, plaintiff adopts the arguments of the ami-

---

**7.** No argument is made that punitive damages should not be awarded in cases involving intentional infliction of emotional distress because compensatory damages for that tort are themselves awarded due to defendant's outrageous conduct. *Cf. Eckenrode v. Life of America Ins. Co.,* 470 F.2d 1, 5 (7th Cir.). It is clear that under Colorado law both compensatory and punitive damages may be awarded for this tort. *Enright v. Groves,* 560 P.2d 851, 854 (Colo. App.).

**8.** Section 13–80–104 provides:
"All actions and suits for any penalty or forfeiture of any penal statute, brought by this state or any person to whom the penalty or forfeiture is given, in whole or in part shall be commenced within one year after the offense is committed and not after that time."
The transactions in question occurred in the latter part of 1973 and this action was commenced on February 14, 1975. This would be within the three-year bar imposed by § 13–80–

109 on actions for fraud and within the six-year bar applicable to actions on the case pursuant to § 13–80–110.

**9.** The cases holding that § 13–80–104 does apply include *Sherwood v. Graco, Inc.,* 427 F.Supp. 155 (D.Colo., Finesilver, J.); *Biser v. Adkins,* 75–F–1096 (D.Colo., January 26 and April 5, 1977, Finesilver, J.) and *Hixon v. Elano Products Co.,* 74–F–1163 (D.Colo., August 17, 1976, Finesilver, J.). Cases holding that § 13–80–104 does not apply include *Dorney v. Harris,* 482 F.Supp. 323 (D.Colo., Kane, J.); *Griswold v. Lange Co.,* C 4681 (D.Colo., April 18, 1977, Arraj, J.); *Alexander v. Graco, Inc.,* 75–W–104 (D.Colo., January 19, 1977, Winner, C.J.); and *Wagner v. Johns-Manville Products Corp.,* 77–0703–2 (District Court, Boulder, Colo., January 10, 1978, Dane, J.); *Resource Exploration & Mining, Inc. v. Itel Corp.,* 492 F.Supp. 515, 517 (D.Colo.) (Carrigan, J.).

cus and says that the special statute itself and the more persuasive opinions demonstrate the inapplicability of the one-year statute.

■ We agree that the issue concerning § 13–80–104 was not presented in the trial court and may not be asserted for the first time on appeal. It is true that defendant's answer includes a fourth defense that "[p]laintiff's claims are barred by the applicable statutes of limitations." (II App. 22). Further, the pre-trial order also includes a statement among defendant's claims ". . . that Plaintiff's claims are barred by the applicable statutes of limitation and the doctrine of laches, ratification, waiver and estoppel . . ." and a statement that one of the contested issues of law, according to defendant, is "[w]hether plaintiff's claims are barred by the applicable statutes of limitations." (II App. 44, 49). Defendant points to no other reference to limitations in the pleadings, orders, trial briefs and cites no reference to § 13–80–104 or the theory that punitive damages claims are governed by the one year statute applicable to actions for any penalty or forfeiture on any penal statute.

We note that defendant's trial brief filed September 13, 1977, following defendant's answer and the September 6, 1977 pre-trial order, contains an argument as Proposition I that a one-year statute of limitations applies to plaintiff's claim under § 12(2) of the 1933 Securities Act. (I Orig.R. 84–85).[10] This Securities Act claim was abandoned by the plaintiff at trial. We note further that the trial brief of plaintiff contained a dis-

cussion of punitive damages, but nowhere within such discussion was any reference to limitations or the applicability of the one-year statute of limitations of § 13–80–104 made. (I Orig.R. 99–102). Furthermore, we note that while the trial judge discussed briefly defendant's objections to the punitive damages verdict in his order denying the post-trial motions, he made no reference to any contention by defendant based on any statute of limitations. 447 F.Supp. at 546.

■ Thus there is not only a failure by plaintiff to assert § 13–80–104 by citation or theory in the trial court. Additionally, a different one-year limitation actually relied on respecting the Security Act claim was identified and argued, and that one year statute became moot when plaintiff withdrew the Security Act claim. Viewing the whole of these circumstances in the record we must agree that the limitation imposed by § 13–80–104 was not raised in the trial court and may not be asserted for the first time on appeal.[11] *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826; *Neu v. Grant,* 548 F.2d 281, 286–87 (10th Cir.); *Stanspec Corp. v. Jelco Inc.,* 464 F.2d 1184, 1187 (10th Cir.); *cf. Chiodo v. General Waterworks Corporation,* 380 F.2d 860, 868 (10th Cir.), *cert. denied,* 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599.

(2) *The challenge to the constitutionality of the punitive damage statute*

Defendant also presents a constitutional argument against the punitive award. It

---

**10.** This limitations argument is grounded on 15 U.S.C. § 77m imposing a one-year limitation on such a securities claim after the discovery of the untrue statement or after such discovery should have been made by the exercise or omission, of reasonable diligence, unless the action is brought within one year after the violation, and in no event more than three years after the sale of the security.

**11.** Defendant additionally argues that the burden is on the plaintiff to show that a claim for a penalty was commenced within the time permitted by the statute, citing *Atchison, T. & S.F.R. Co. v. Tanner,* 36 P. 541 (Colo.) and *Denning v. A.D. Wilson & Co.,* 326 P.2d 77

(Colo.). We recognize that in a diversity case the question of the burden of proof is one of local law, even though the pleading requirements are controlled by federal law. *See Palmer v. Hoffman,* 318 U.S. 109, 116–17, 63 S.Ct. 477, 481–82, 87 L.Ed. 645. However, assuming the correctness of defendant's argument that the one-year statute applies, and that plaintiff had the burden of proving the claim was brought within one year, there is no indication from the record that defendant raised the issue concerning § 13–80–104 at trial, or otherwise in the trial court, as noted. Under these circumstances we will not now consider this issue.

contends that the Colorado punitive damages statute, as applied in this case, is violative of the federal Due Process and Equal Protection Clauses as well as the Due Process Clause of the Colorado constitution. Defendant reasons that punitive damages are penal in nature and serve the same functions as criminal punishment. Yet none of the procedural safeguards imposed in criminal proceedings are afforded defendants subjected to punitive damages. (Brief of Defendant, 45–52).

Plaintiff again responds that this argument was not raised at trial and hence cannot be raised now. Replying on the merits, plaintiff says that punitive damages statutes have been upheld by the Supreme Court of the United States against like objections and that no violations of due process occurred here. Further plaintiff argues that there are clear standards in the statute which are applied with a great deal of certainty by the Colorado courts. (Brief of Plaintiff, 58–60).

We have on occasion addressed questions raised for the first time on appeal when they involved due process implications. *E.g., Staton v. Mayes,* 552 F.2d 908, 915 (10th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195; *Gomes v. Williams,* 420 F.2d 1364, 1367 (10th Cir.); *but see Curtis Publishing Co. v. Butts,* 388 U.S. 130, 143, 87 S.Ct. 1975, 1985, 18 L.Ed.2d 1094. Here we feel we should consider the constitutional claim involving the due process and equal protection issues raised.

■ We note that the defendant is not alone in questioning the validity of punitive damage statutes. *See, e.g.,* Dobbs, Handbook on the Law of Remedies, § 3.9, 219–20. Nevertheless, the Supreme Court has clearly recognized that "... the Constitution presents no general bar to the assessment of punitive damages in a civil case ..." *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 159, 87 S.Ct. 1975, 1993, 18 L.Ed.2d 1094; *see Day v. Woodworth,* 13 How. 363, 372, 54 U.S. 362, 371, 14 L.Ed. 181, and we are not persuaded that any basis for a departure from this view is demonstrated. The statute does clearly define strict standards and they are applied carefully by the courts, as the trial judge did here. Therefore we are convinced· that the statute is valid and not violative of the federal or State constitutions.[12]

(3) *The claim that the evidence supported no award of punitive damages and that the award was grossly excessive*

Defendant argues that to impose punitive damages against a corporation for the acts of an employee it must be shown that the corporation authorized or approved the act for which exemplary damages are claimed, or that it approved of or participated in the wrong of its agent, or that it failed to exercise proper care in selecting its agent. Defendant contends that approval of a specific transaction without knowledge of its wrongful aspects is an insufficient basis for holding a corporation liable for punitive damages. Yet no more than this was proven at trial; *i.e.* "that the sales manager and officer of defendant's Denver office had approved the opening of an account in plaintiff's name and were aware that the stock transactions had occurred." (Brief of Defendant, 38). And, according to defendant, "there was not a scintilla of evidence to indicate that any member of defendant's management knew of the alleged wrongs, let alone authorized or participated in them." (*Id.,* 39). Further, it argues that there is no evidence to indicate that defendant was negligent in hiring Mr. Barron. Even if the court was correct in stating

---

**12.** We find no Colorado case dealing with the specific due process arguments of defendant. An equal protection argument and a double jeopardy contention, based on a prior criminal conviction preceding the damage suit alleging the same facts, were rejected in *E.F. Hutton and Co. v. Anderson,* 596 P.2d 413 (Colo.App.). While not addressing constitutional challenges, opinions of the Colorado Supreme Court have upheld punitive damages awards under this same statute. *E.g., Kresse v. Bennett,* 379 P.2d 807, (Colo.); *see also Herald Co. v. Harper,* 293 F.Supp. 1101, 1105 (E.D.Mo.), *aff'd.,* 410 F.2d 125 (8th Cir.); *Daugherty v. Firestone Tire and Rubber Co.,* 85 F.R.D. 693 (N.D.Ga.); Annotation, Constitutionality of Statute Permitting Punitive Damages for Personal Injury or Death, 51 A.L.R. 1379.

that defendant was negligent in supervising Mr. Barron, negligent supervision is not a sufficient basis on which to impose punitive damages.

Additionally, defendant asserts that the court erroneously failed to instruct the jury that plaintiff must prove beyond a reasonable doubt both the commission of the alleged wrong and the authorization, approval or participation by the corporation. Similarly, defendant says that the court erred in refusing to charge that an officer or director of defendant must have authorized or participated in the wrong, rather than someone as subordinate as a local manager. (*Id.,* 36–40).

In rejecting the defendant's objections to the punitive award the trial judge stated in his Memorandum and Order (447 F.Supp. at 546):

> The defendant contends that punitive damages are not allowable in this case. On this issue the jury was instructed that such damages could be considered only if the plaintiff had proven beyond a reasonable doubt that the injury was attended by circumstances of fraud, malice, insult or a wanton and reckless disregard of the rights and feelings of the plaintiff. Again, I join the jury in the view that the evidence was sufficient to make such a finding and the amount of the damages imposed as a sanction against the defendant bears a reasonable relationship to the amount of the compensatory damages in the verdict. *Big O Tire Dealers, Inc. v.*

*Goodyear Tire & Rubber Co.,* 561 F.2d 1365 (10th Cir.1977).

To say, as defendant argues, that the corporate defendant cannot be sanctioned for the misconduct of its employee in this case is to ignore the evidence that the sales manager and office manager of the Denver office of Merrill Lynch approved and participated in that misconduct and failed to exercise proper care in selecting and supervising this salesperson. The jury was properly instructed and there is sufficient evidence to support the verdict for punitive damages.

We are persuaded to agree with the trial court's conclusions to the extent that a substantial punitive award was justified and permissible under Colorado law. However, for reasons given later we cannot agree to sustain a punitive award of this size in these circumstances.

Colorado has long allowed punitive damages.[13] However, the rule has developed that a principal cannot be held liable in exemplary damages for the act of an agent unless it is shown that it: (a) authorized or approved the servant's tortious act; or (b) approved of or participated in the act; or (c) failed to exercise proper care in the selection of its servant.[14] *Holland Furnace Co. v. Robson,* 402 P.2d 628, 631 (Colo.); *see Ristine v. Blocker,* 61 P. 486, 489 (Colo. App.); *Lake Shore & Michigan Southern Railway Co. v. Prentice,* 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97; Restatement (Second) Agency § 217C;[15] Restatement

---

**13.** Sec. 13–21–102, Colo.Rev.Stat. (1973), derived from an 1889 statute, provides:

> Exemplary damages. In all civil actions in which damages are assessed by a jury for a wrong done to the person, or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages.

**14.** This rule, known as the complicity rule, is apparently the current minority rule, while the majority of courts allow punitive damages against the employer under ordinary principles of respondeat superior. *See* Dobb, Handbook

on the Law of Remedies, §§ 3.9, 214 (1973); Prosser, Handbook on the Law of Torts, §§ 2, 12 (1971).

**15.** Section 217C provides:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:
> (a) the principal authorized the doing and the manner of the act, or
> (b) the agent was unfit and the principal was reckless in employing him, or
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
> (d) the principal or a managerial agent of the principal ratified or approved the act.

(Second) Torts § 909.[16]

We agree with defendant that the evidence does not indicate that it failed to exercise proper care in the selection of Mr. Barron. Nevertheless, although the question is close we feel the proof was sufficient to go to the jury on the issue of punitive damages since there was some evidence to support inferences of authorization or approval and participation by defendant's local managers [17] in the tortious acts to the extent of being wanton and reckless in handling the transactions.[18] Defendant's rules, rules of the New York Stock Exchange, and of the Chicago Board Options Exchange were in evidence. From the various rules there were stated duties for defendant's office manager or his designate to be informed as to the essential facts relative to the customer to approve opening his account, to satisfy himself as to the desirability of such customer before approving the acceptance of the account, to "qualify" the customer before allowing him to trade in options (and stating that in some cases he may want to have a personal interview with the customer, see Plaintiff's Ex. 31), and to approve a switch from a cash to a margin account. (V App. 561–591; see, e.g., Plaintiff's Exhibits 21–41). The trial court properly charged the jury that (VI App. 912):

You have also heard testimony about these rules. While these rules do not have the force of law and while no liability can be found to result from the mere violation of any or all of such rules, you may consider the fact that the Defendant was a member of these organizations which had adopted these rules in considering whether the conduct of the Defendant was such that liability should be found under these instructions which are the applicable law in this case.

See Master Commodities, Inc. v. Texas Cattle Management Co., 586 F.2d 1352, 1357 (10th Cir.); Carelli v. Denver & Rio Grande Western R.R. (No. 72–1487, 10th Cir., 12/26/73, pp. 5–6) (unpublished).

Defendant argues that "it is unreasonable to suggest that the sales manager should be required to conduct a personal interview as to everyone," and that at most the manager was negligent in his supervision of plaintiff's account. While this argument is persuasive, we do not feel the trial court erred in submitting the punitive damages issue to the jury. The evidence included the rules as evidentiary matter and evidence permitting an inference of lack of any managerial contact with plaintiff or any meaningful review or supervision of her transactions. There was evidence indicating that defendant took Mrs. Malandris' stock as collateral for its loan, without any authorization from her,[19] when the account

---

16. Section 909 provides:
 Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
 (a) the principal or a managerial agent authorized the doing and the manner of the act, or
 (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
 (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
 (d) the principal or a managerial agent of the principal ratified or approved the act.

17. We reject defendant's assertion that the actions of a local manager are insufficient to allow the imposition of punitive damages against the corporation, especially where, as here, defendant delegated a great deal of authority to its local branch managers. See Doralee Estates v. Cities Service Oil Co., 569 F.2d

716, 721–22 (2d Cir.); General Motors Acceptance Corp. v. Froelich, 273 F.2d 92 (D.C.Cir.); Restatement (Second) Torts § 909.

18. Hence we need not decide whether negligent supervision is sufficient per se to impose punitive damages against the corporation. In the instant case, it could be found that defendant's managerial agents had an affirmative duty to participate in and approve some of the account decisions, as discussed below. These duties would necessarily include supervision of the account.

19. There was evidence indicating that an hypothecation agreement had been signed by Mr. Malandris in his own name, but that this authorization was returned by the New York office (which approved all such documents) requesting an authorization signed by the customer, Mrs. Malandris. (III A. 186–203). The request for a properly executed hypothecation was routed to Mr. Barron by a new accounts clerk

was switched to a margin account. (V A. 577–78).

Defendant's Denver sales manager testified that to the best of his knowledge, he did approve the switch of plaintiff's account from cash to margin. (V A. 569). While written approval by defendant's manager was required before options transactions could be conducted, defendant produced no such writing. Defendant's own compliance rules forbid Merrill Lynch employees acting as witnesses on power of attorney forms, but one of its employees witnessed the forged signature on the power of attorney in this account. Defendant's Denver sales manager testified that he initialed approval of the unsolicited order for the sale of 5,000 shares of Northwest Airlines stock at $17.25 per share which liquidated most of Mrs. Malandris' account. (V A. 585–86; *see* note 4b, *supra*). While the case is not free from doubt, considering all the evidence the jury could draw the inference that there was some managerial participation in wanton and reckless handling of the transactions so that the punitive damage matter was a jury issue. *See* Restatement (Second) Agency § 213 and comment h.

The argument that the managers had no knowledge of Barron's conduct is not persuasive. There was evidence from which substantial responsibility of the managers for knowing about this type of transaction could be inferred. It could be found that the managers themselves disregarded proper safety procedures, indicating wanton and reckless conduct on the part of management. *See Leslie v. Jones Chemical Co.,* 92 Nev. 391, 551 P.2d 234, 235; *Franklin Inv. Co. v. Smith,* 383 A.2d 355, 359 (D.C.App.); *S.H. Kress & Co. v. Rust,* 120 S.W.2d 425, 428 (Tex.).

■ Further, we do not find reversible error in the court's failure to instruct that plaintiff must prove beyond a reasonable doubt both the commission of the alleged wrong *and* the authorization, approval or participation in the wrongful act by the corporate management. Defendant did not make such an objection to the charge at trial. (VI App. 822–27, 927–28). We deem the objection waived and do not consider it here. F.R.Civ.P. 51; *Scholz Homes, Inc. v. Wallace,* 590 F.2d 860, 864 (10th Cir.). And in view of the charge given on the burden of proof as to punitive damages,[20] we see no plain error. (See VI A. 920–21, 926).

in Denver when it was received from New York. *Id.* There was no evidence that an hypothecation agreement was ever signed by Mrs. Malandris or in her name.

**20.** Defendant bases this assertion on 1973 Colo. Rev.Stat. § 13–25–127(2), which provides:

Exemplary damages against the party against whom the claim is asserted shall only be awarded in a civil action when the party asserting the claim proves beyond a reasonable doubt the commission of a wrong under the circumstances set forth in section 13–21–102. Nothing in this subsection (2) shall be construed as preventing a party asserting the claim from being awarded money damages or other appropriate relief, other than exemplary damages, if he sustains the burden of proof by a preponderance of the evidence.

The instruction given by the trial court explicitly stated that the plaintiff must prove "beyond a reasonable doubt that the injury complained of was attended by circumstances of fraud, malice, insult or a wanton and reckless disregard of the rights and feelings of the Plaintiff." (VI App. 920). Further, the charge stated that in order to award punitive damages the jury must also further find that the plaintiff

had proved that the Denver sales manager or office manager authorized or approved the manner and doing of the act for which exemplary damages are claimed, or that they approved of or participated in the wrong of the agent, or that they failed to exercise proper care in selecting the agent and he was unfit. (*Id.* at 921). Then, in a later portion of the charge on compensatory and punitive damages the court instructed the jurors, ". . . and if you find beyond a reasonable doubt that punitive damages should be awarded in the case, then you would use the form of verdict for Plaintiff on punitive damages." (*Id.* at 926).

As stated earlier, we feel the evidence was insufficient to establish that defendant was negligent in hiring Mr. Barron. Hence the portion of the instructions noted above presenting the alternative theory of negligent hiring was subject to an objection. Where there is an objection to the erroneous submission of one alternative theory of liability, it can be argued that a general verdict cannot stand since it cannot be determined whether the jury based liability on the theory erroneously submitted. *E.g., Sunkist v. Winckler & Smith Co.,* 370 U.S. 19, 27, 30, 82 S.Ct. 1130, 1134, 1136, 8 L.Ed.2d 305. Here, although defendant argued that

In sum, we are satisfied that no reversible error is demonstrated in the submission to the jury of the punitive damage issue.

We turn now to defendant's vigorous objections that the $3,000,000 punitive award is grossly excessive. Defendant says that the award bears no rational relationship to the alleged injury and notes that it is three times the size of the maximum fine permitted under federal law for a criminal act. It says that this demonstrates that "the verdict was dictated by emotion, and not by any reasoned consideration of the evidence." (Brief of Defendant 35–36).

■ The Colorado Supreme Court has stated that the purpose of punitive damages is to punish the wrongdoer and deter similar conduct in the future. *Frick v. Abell,* 602 P.2d 852, 854 (Colo.). The proper factors to be considered include: (1) the nature of the act which caused the injury; (2) the economic status of the defendant; and (3) the deterrent effect of the award on others. *Id.* In addition, Colorado requires that the punitive damages bear some relation to the compensatory award. *Big O Tire Dealers v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1376 (10th Cir.), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805; *Wegner v. Rodeo Cowboys Association,* 290 F.Supp. 369, 370 (D.Colo.); *aff'd,* 417 F.2d 881 (10th Cir.), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 60.

Punitive damages have been sustained under Colorado law in ratios as high as six-to-one in comparison to compensatory damages. *See Big O Tire Dealers, supra.* Thus the approximately three-to-one ratio in the present case presents no problem in itself. Moreover, there was evidence indicating that in 1976 defendant had total assets worth over six billion, six hundred million dollars, shareholders' equity of over six hundred thirty-two million dollars, and a net worth of over one hundred six million dollars. (*See* Plaintiff's Ex. 85). However, the crucial question for us here is whether the punitive award was so excessive that it shocks the judicial conscience or leads to an inescapable inference that it resulted from improper passion or prejudice on the part of the jury.

■ We must agree the $3,000,000 punitive award is excessive and unwarranted. An award of substantial compensatory damages and sizeable financial worth do not inescapably mean that some ratio of punitive damages is permissible. The question remains here as to whether the verdict is shocking to the conscience of the court or excessive under the statute providing that the jury "may award [the plaintiff] reasonable exemplary damages." § 13–21–102, Colo.Rev.Stat. (1973); *see, Kresse v. Bennett, supra,* 379 P.2d at 808. Keeping in mind all the relevant factors we are convinced that the $3,000,000 award is excessive and beyond a reasonable punitive award under the Colorado statute and must be reduced. *See Lanfranconi v. Tidewater Oil Co.,* 376 F.2d 91, 96–98 (2d Cir.), *cert. denied,* 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361; *Kresse v. Bennett, supra,* 379 P.2d at 808; *Mooney v. Henderson Portion Pack Co.,* 339 F.2d 64, 65–66 (6th Cir.); *Texas Co. v. Christian,* 177 F.2d 759, 762 (5th Cir.).

This conviction that the punitive award was excessive does not lead us to the conclusion that the liability determination was tainted here. As explained in Part I C,

---

there was no corporate involvement on any basis for submission of the punitive damage issue, defendant did not object to the instruction at trial, or on appeal, on the ground that it included an alternative submission of the negligent hiring theory, and the charge given was similar in this respect to defendant's tendered instruction on the complicity rule which included the alternative of negligent hiring. (I. R.160). There was sufficient evidence to sustain punitive damages under the other theories of managerial involvement. In these circumstances, we feel that any error in submitting the negligent hiring theory should not now be considered on appeal. *Union Pacific Railroad Co. v. Lumbert,* 401 F.2d 699, 701–02 (10th Cir.); *Comins v. Scrivener,* 214 F.2d 810, 814 (10th Cir.); *Rochester Civic Theatre, Inc. v. Ramsay,* 368 F.2d 748, 751–53 (8th Cir.). *See Continental Oil Co. v. Brack,* 381 F.2d 682, 684–85 (10th Cir.); *Sunkist v. Winckler & Smith Co., supra,* 370 U.S. at 27, 82 S.Ct. at 1134.

*supra,* we are persuaded that a new trial on liability need not be ordered and that the established remedy of remittitur, long used by the federal courts, is proper and fair here.[20a] We are convinced, therefore, that we should require a remittitur to reduce the punitive award to $1,000,000, for the judgment to stand. If the plaintiff declines to accept a reduced judgment, there should be a new trial on all issues since we feel that a new trial on less than all the issues could not be had without confusion and uncertainty, which would amount to a denial of a fair trial. *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188. Accordingly we remand the cause with directions that the trial court enter a remittitur order for acceptance of a judgment reducing the punitive award to $1,000,000, or otherwise for a new trial of all issues.

### E. *Defendant's motion for a mistrial*

In the appeal from the original judgment, defendant argues further that the court should have granted a mistrial due to emotional outbursts by plaintiff and her husband during Mr. Barron's testimony. The denial of the motion was an abuse of discretion, according to defendant. Although the jury was asked to leave when the outbursts began, defendant contends that the jury was present during at least part of the scene. Further, defendant suggests that plaintiff's counsel should have anticipated that such a reaction would occur and should not have allowed the plaintiff to be present during Barron's testimony.

Defendant adds that the above errors were compounded by plaintiff's counsel who "repeatedly appealed for sympathy for the plaintiff, and sought to incite hostility against the defendant," by references to plaintiff's poverty and defendant's wealth. (Brief of Defendant, 25–31). Further, the "cumulative prejudice" was increased due to "speeches and outbursts" by plaintiff's husband during Barron's cross-examination. (*Id.*) Thus, alternatively defendant urges this court at least to reverse for a new trial.

The conduct which prompted the motion for a mistrial came during the redirect examination of Mr. Barron, and was described by the trial judge as follows:

> The record ought to reflect that during the testimony of Mr. Barron on cross-examination by Mr. Fishman, Mrs. Malandris, who was seated in the public sector of the courtroom in the first row behind the bar, began to cry and then began to scream, and I ordered the jury out of the box and excused them. As they were walking out of the box, Mr. Malandris jumped up and began to yell, something about, "How can a man lie like that?" and began to pound his fists against the seat. (V App. 723–24).

The jury was excused as soon as Mrs. Malandris' outburst began. The trial judge could not say on his own observation where the jury was when Mr. Malandris began to yell, but thought the jurors were on their way out. *Id.* at 724. An immediate motion for a mistrial was made and denied. (*Id.*) The jurors were given a cautionary instruction when they returned to the courtroom including, *inter alia,* instructions not to consider the outbursts as evidence, not to allow such occurrences to affect their opinion, and not to judge the case on the basis of sympathy or prejudice. (V App. 724–25). A subsequent motion for a new trial, based in part on these outbursts, was denied by the trial judge for reasons which he explained in detail (447 F.Supp. at 546–47):

> The intervening day of testimony and weekend between the Malandris' conduct and closing arguments and submission to the jury must be considered in evaluating any effect of this unfortunate incident on the jury's deliberation. Additionally, the conduct of Mr. and Mrs. Malandris must be viewed in the context of the trial. There is nothing to indicate that either of these people engaged in any theatrics or that they deliberately attempted to use this as a means to communicate with the

**20a.** The authorities cited in Part I C, *supra,* and cases noted in the text above illustrate familiar use of the remittitur remedy as proper. *See* the discussion in 6A Moore's Federal Practice, ¶ 59.05[3] pp. 59–47 to 59–68.

jury. Having observed the entire trial, including the incident in question, it is my finding and conclusion that these outbursts were genuine human responses to testimony which was not credible and which went directly to the pivotal issues in the case. Mrs. Malandris' actions were entirely consistent with the testimony of both psychiatrists. Mr. Malandris' reaction to the testimony of Mr. Barron can best be characterized as instinctive, uncontrolled anger. It is not possible to try lawsuits in a sterile chamber, wholly free from the effects of human emotions, particularly in a case in which the injury complained of is severe emotional distress. The prejudice to the defendant in this case from the emotional outburst by the plaintiff is no greater than a plaintiff's display of disfigured or dismembered parts of his body on a claim for physical injury. *See* S. Gard, *Jones on Evidence* § 15:4 at 10 (6th ed. 1972).

■ While both parties have cited state court decisions which may indeed be considered, the ruling on such a motion is governed by federal law. *See Holmes v. Wack,* 464 F.2d 86, 88 (10th Cir.); 6A Moore's Federal Practice ¶ 59.05. The matter of declaring a mistrial or granting a new trial on such grounds is peculiarly within the discretion of the trial judge for he is in a better position than this court to assess the potentially prejudicial impact of such conduct by parties, witnesses and counsel. *Standard Industries, Inc. v. Mobil Oil Corp,* 475 F.2d 220, 228 (10th Cir.), *cert. denied,* 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63; *see Franklin v. Shelton,* 250 F.2d 92, 99–100 (10th Cir.), *cert. denied,* 355 U.S. 959, 78 S.Ct. 544, 2 L.Ed.2d 533.

Furthermore, even though it is true, as plaintiff states, that defendant did not object to many of the errors it now complains of, we acknowledge the proposition asserted by defendant that litigants are entitled to a fair trial and that frequent objections, even though valid, may prejudice the party objecting. *Koufakis v. Carvel,* 425 F.2d 892, 900–901 (2d Cir.). Hence we have considered these claims of error to determine whether they were of such magnitude as to have seriously prejudiced defendants' right to a fair trial. *Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276, 286 (5th Cir.).

■ We conclude that the trial court did not abuse its discretion in these circumstances. As noted in *Franklin v. Shelton, supra,* 250 F.2d at 99:

[T]he conduct of a party in weeping or crying in the courtroom does not necessarily justify a new trial, where it does not clearly appear that such conduct improperly influenced the jury. Nothing in the record indicates that the trial Judge abused his discretion in not ordering a mistrial. It must be presumed that he was in the best position to discover whether plaintiff's conduct had such an effect upon the jury that the trial could not continue on a fair basis.

*See also Price v. H.B. Green Transportation Line Inc.,* 287 F.2d 363, 364 (7th Cir.).

■ In view of the trial judge's conclusions we have noted, we cannot agree that the conduct of the plaintiff and her husband is comparable to the "schooled histrionics, affected ignorance of matters on which they possessed virtually expert knowledge, [and] their dramatizations and theatrical displays" which would have required a new trial in the court's opinion, although dismissal was ordered on other grounds in *Drasner v. Thomson McKinnon Securities, Inc.,* 433 F.Supp. 485, 489–91 (S.D.N.Y.); *see Cecil Corley Motor Co. v. General Motors Corp.,* 380 F.Supp. 819, 861 (M.D.Tenn.). Nor did the closing argument of plaintiff's counsel "so far exceed the bounds of proper argument that we are bound to reverse the district court," as was done in *Draper v. Airco, Inc.,* 580 F.2d 91, 94 (3d Cir.), and *Edwards v. Sears, Roebuck and Company,* 512 F.2d 276 (5th Cir.). Taken together, the theories of liability and the compensatory and punitive damages issues justified fair comment, within reasonable bounds of vigorous advocacy, on defendant's conduct, its financial status, and the purpose of deterrence.

We are satisfied that there was no abuse of discretion or reversible error in the denial of the motion for a mistrial.

## II
## THE APPEAL FROM THE DENIAL OF THE RULE 60(b) MOTION

In No. 78–1855 defendant appeals from the trial court's order denying defendant's motion to set aside the judgment and to grant a new trial pursuant to F.R.Civ.P. 60(b)(2) and (3).[21]

Defendant asserts that newly discovered evidence secured from the SEC, the FBI and the Denver District Attorney's office, demonstrates that Mr. Malandris lied throughout the trial. According to Merrill Lynch this evidence shows, *inter alia:* 1) that Mr. Malandris sought to file a false criminal report accusing Barron of having forged plaintiff's signature to a power of attorney, which Mr. Malandris subsequently admitted having forged himself; 2) that Mr. Malandris first came to Merrill Lynch because he wanted to "sell short" and his previous broker would not allow him to do so; 3) that before trial Mr. Malandris had demonstrated substantial knowledge of financial matters, even to the point of correcting a mistake by an SEC attorney as to the mechanics of selling short; and 4) that Mr. Malandris was not totally dependent on Barron for investment advice and admitted to the FBI that in November 1973 he directed Barron to execute certain stock transactions. (Brief of Defendant 9–10).

Defendant claims that this evidence is newly discovered, could not have been discovered in time to move for a new trial under F.R.Civ.P. 59(b), and is of such a material and controlling nature that it would probably change the verdict. Because the case was dependent almost entirely on the testimony of Mr. Barron and Mr. Malandris, credibility was a crucial factor in the case. Thus defendant argues that the newly discovered evidence, directly contrary to Mr. Malandris' testimony at trial, would have changed the outcome of the trial. De-

fendant maintains that, contrary to the trial court's determination, it had indeed exercised due diligence in attempting to gather this information at an earlier time. It was not a lack of diligence but rather a change in circumstances that resulted in the evidence being produced after the judgment. According to defendant, various Government agencies had repeatedly refused requests to produce evidence until the changed circumstance of the large verdict in this case. It was only then that the agencies decided, "in the interest of justice," to release additional information. (*Id.* 19–26).

Defendant additionally argues that this same evidence demonstrates that the judgment was procured through fraud in that it shows that Mr. Malandris "repeatedly and systematically perjured himself at trial..." (*id.* at 26); accordingly the judgment should have been set aside and a new trial granted.

Plaintiff responds that defendant's allegations are unsupported by any admissible evidence. Further, this "new" evidence concerns collateral issues or seeks only to impeach Mr. Malandris' testimony. Plaintiff argues that defendant was not diligent in attempting to locate this evidence since it made no formal attempts to obtain any information from Government sources prior to trial. In fact, plaintiff says that much of the allegedly "new" evidence was in defendant's possession before trial and some of it was actually used by the defendant at trial. (Brief of Plaintiff at 1–7).

At the conclusion of a hearing the trial court denied defendant's motion. With respect to the 60(b)(2) motion, it was found that the evidence would be impeaching and collateral and also that defendant failed to make an adequate showing that the information was not available at an earlier time through the exercise of due diligence. With respect to the claim under Rule

---

**21.** F.R.Civ.P. 60(b) provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due

diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party ....

60(b)(3), the court held that fraud had not been shown. (VIII App. 1114–1118).

■ We are satisfied that the record amply supports the trial court's findings and conclusions made in denying the motion. There is evidence that much of the proof could have been discovered earlier through due diligence such as by the filing of formal Freedom of Information Act requests promptly or by contacting parties known to defendant prior to trial who might have pertinent information. Nor do we feel that the district court erred in holding that fraud had not been shown, particularly in view of his conclusions, formed at his vantage point, on the credibility of the two principal witnesses. In holding that the testimony about the SEC contact with Mr. Malandris and Mr. Malandris' contacts with the Denver District Attorney's office did not justify a new trial, the trial judge stated (VIII A. at 1115):

I sat through this trial. I watched both of these witnesses whose testimony is challenged sitting on that witness stand, and it is my view that if that additional [24] testimony had been presented at trial, it would not have changed my opinion which I expressed myself in the post verdict memorandum and order that I join the jury in believing the version of the contacts with the Merrill, Lynch firm and Mr. Barron that was given by Mr. Malandris, and I do not believe the testimony of Mr. Barron.

■ In reviewing the denial of a Rule 60(b) motion, we are mindful that the decision whether to grant relief is addressed to the sound discretion of the trial court. *Chief Freight Lines Co. v. Local Union No. 886*, 514 F.2d 572, 576–77 (10th Cir.); *Wilkin v. Sunbeam Corp.*, 466 F.2d 714 (10th Cir.), *cert. denied*, 409 U.S. 1126, 93 S.Ct. 940, 35 L.Ed.2d 258. We are generally limited to determining whether the ruling amounts to an abuse of discretion. *V.T.A., Inc. v. Airco, Inc.*, 597 F.2d 220, 223 (10th Cir.); *see Security Mutual Cas. Co. v. Century Cas. Co.*, 621 F.2d 1062, 1068 (10th Cir.). We conclude that the record supports the trial judge's ruling and that he did not err or abuse his discretion in denying the Rule 60(b) motion for a new trial.

## CONCLUSION

Accordingly, in No. 78–1855 the district court's order denying the motion made under Rule 60(b) is affirmed. In No. 77–1957, we conclude that the judgment should be affirmed, provided that the plaintiff accepts a reduction in the punitive award to $1,000,-000. Therefore the cause is remanded to the district court with directions that an order be entered providing that if, within a reasonable time to be fixed by the district court, the plaintiff accepts a reduction of the judgment by reducing the punitive damages award to $1,000,000 or thus a total judgment of $2,030,000, with costs and interest as provided in and accruing from the entry of the original judgment, then the judgment as so modified shall be final; otherwise, an order shall be entered granting a new trial of the cause.

LOGAN, Circuit Judge, dissenting:

I agree with most of the analysis in the carefully crafted majority opinion. But in important respects I disagree and, therefore, must dissent.

The trial judge here refused to grant a new trial sought by Merrill Lynch on grounds that the actual and punitive damages awards were grossly excessive. As an appellate court reviewing that denial, we apply the well-established abuse of discretion standard. *E.g., Brown v. Richard H. Wacholz, Inc.*, 467 F.2d 18 (10th Cir.1972); *Barnes v. Smith*, 305 F.2d 226 (10th Cir. 1962). This Circuit has firmly stated that "absent an award so excessive or inadequate as to shock the judicial conscience *and* to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the fact is considered inviolate." *Id.*, 305 F.2d at 228 (emphasis added). In many cases through the years we have made the same categorical statements that the judgment must be affirmed unless the award is so high that passion and prejudice must have affected the verdict. *See*

*Minker v. St. Louis-S.F. Ry.,* 574 F.2d 1056 (10th Cir.1978); *Brown v. Skaggs-Albertson's Properties, Inc.,* 563 F.2d 983 (10th Cir.1977); *Metcalfe v. Atchison, T. & S.F. Ry.,* 491 F.2d 892 (10th Cir.1974); *Brown v. Richard H. Wacholz, Inc.,* 467 F.2d 18 (10th Cir.1972); *Ketchum v. Nall,* 425 F.2d 242 (10th Cir.1970); *Lane v. Gorman,* 347 F.2d 332 (10th Cir.1965); *Greyhound Corp. v. Jones,* 327 F.2d 904 (10th Cir.1964); *Franklin v. Shelton,* 250 F.2d 92 (10th Cir.1957), cert. denied, 355 U.S. 959, 78 S.Ct. 544, 2 L.Ed.2d 533 (1958); *E.L. Farmer & Co. v. Hooks,* 239 F.2d 547 (10th Cir.1956), cert. denied, 353 U.S. 911, 77 S.Ct. 669, 1 L.Ed.2d 665 (1957); *Chicago, R.I. & Pac. Ry. v. Kifer,* 216 F.2d 753 (10th Cir.1954), cert. denied, 348 U.S. 917, 75 S.Ct. 299, 99 L.Ed. 719 (1955); *Earl W. Baker & Co. v. Lagaly,* 144 F.2d 344 (10th Cir.1944).

If the verdict is the result of passion and prejudice we must reverse and send the case back for a new trial. *Minneapolis, St. P. & S.S.M.R. v. Moquin,* 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243 (1931); 11 Wright & Miller, Federal Practice and Procedure, § 2815 (1973); 6A Moore's Federal Practice ¶ 59.05[3], p. 59–59 (1979). In *Moquin,* the Supreme Court forbade the use of remittitur in a case where the verdict was found excessive as a result of passion or prejudice. As explained in *Moquin,*

> "no verdict can be permitted to stand which is found to be in any degree the result of appeals to passion and prejudice. Obviously such means [prejudicial conduct] may be quite as effective to beget a wholly wrong verdict as to produce an excessive one. A litigant gaining a verdict thereby will not be permitted the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent."

283 U.S. at 521–22, 51 S.Ct. at 502.

Appellate courts have ordered remittiturs when reversible error is found in the trial proceedings, the effects of which can be reasonably approximated to either a definite portion of a verdict or a maximum amount. *See* 6A Moore's Federal Practice

¶ 59.05(3) (1979). We did that in *R.E.B., Inc. v. Ralston Purina Co.,* 525 F.2d 749 (10th Cir.1975), when erroneous instructions resulted in the jury awarding double recovery. *See also Allied Materials Corp. v. Superior Products Co.,* 620 F.2d 224 (10th Cir. 1980). I recognize that some other appellate courts seem to have gone further and substituted their judgment for that of a jury or trial judge, when they considered the damages merely excessive. *E.g., Abernathy v. Southern Pac. Ry.,* 426 F.2d 512 (5th Cir.1970); *Lanfranconi v. Tidewater Oil Co.,* 376 F.2d 91 (2d Cir.1967).

The instant case is not one in which we can reasonably approximate the amount of the jury's error without acting as a second jury. The awards at issue here—for emotional suffering and punitive damages—are of such indeterminate character that there are no criteria for segregation. We have only our overall impressions to guide us, our judicial conscience. I do not trust the personal opinion of appellate judges, including myself, based on a review of the written record only, to fine-tune damages awards in such a case; but I can determine whether an award is so excessive as to shock my judicial conscience and raise the irresistible inference that passion and prejudice affected the jury verdict.

This is such a case, I believe, and I think the proper approach is to remand for retrial so that new fact-finders can assess the proper damages to award. The actual damages award made in this case profoundly shocks me to the extent I am convinced passion and prejudice entered into the determination. The world has changed a great deal since a judgment of $5,000 for the death of a six-year old would be challenged as excessive. *See, e.g., Earl W. Baker & Co. v. Lagaly,* 144 F.2d 344 (10th Cir.1944). Still, apparently the largest verdict for emotional stress ever awarded in Colorado is $30,000. Merrill Lynch claims the largest award previously made in the United States is $60,000, when there was no physical injury or death. One publication specializing in reporting personal injury verdicts indicates awards as high as $90,000

for intentional infliction of mental suffering, though it is not apparent whether physical injury occurred there. 2A Personal Injury Valuation Handbooks 1455 (1976). Here the award for mental suffering is $1,000,000. This figure appears to have been plucked from the air; it is not supported by any documentation. Mrs. Malandris' condition required neither hospitalization nor professional care at home. Indeed, we have no evidence she saw any doctor other than the psychiatrist who testified for her at trial. She was able to attend the trial and to be a witness, although she cried a lot on the stand. The record shows her neurosis stemming from the Merrill Lynch incident was preceded by emotional problems relating to a host of other personal troubles.

The same infirmity seems to apply to the punitive damages award. I am not prepared to say a $3,000,000 award against a national corporation is excessive in all circumstances. Relevant to corporate liability for punitive damages is the management level of the officials who participated in the tort or who could be regarded as culpable. Here only Barron's immediate supervisors were inculpated to any degree, and the evidence against them merely suggests they disregarded proper safety procedures established by the company. Considering the low level of corporate involvement in this case, I am convinced that this $3,000,000 punitive damages award is a product of passion and prejudice.

In reaching my conclusions I am also influenced in part by several highly inflammatory moments during the trial. During Barron's testimony on the pivotal issues of the case, Mrs. Malandris began crying and screaming. As the jury was being removed from the room because of that incident, Mr. Malandris jumped up and yelled that he would kill Barron and that Barron was a liar. (App. 721–23). This dramatic scene was preceded by a brief direct examination of Mrs. Malandris, during which she apparently wept at nearly each question. (App. 556–61). Another incident involved Mr. Malandris. During cross-examination, confronted with the fact that his deposition conflicted with his testimony that he never read the New York Times, Malandris replied,

"That is not true. You are saying things. If you want to say it, say it.

"I'm talking, not you. I'm not no match for no 20 people in college. If you want to trick me, fine, you can do it, trick me, it is a very easy thing to do. Make you feel like a big man, just do it, fine."

Upon being cautioned to just answer the question, Malandris replied: "I'm sorry. I have never read the New York Times. God help me, so help me, let me die in this chair." (App. 404–05).

Because punitive damages were sought, counsel for Malandris was allowed to comment to the jury on Merrill Lynch's considerable net worth. On the other hand, because Malandris' emotional distress resulted from her loss of financial security, her extremely impoverished life was presented. Counsel requested the jury to

"send a message, a warning, a deterrent to this country, to this state, to this city, to New York, to Chicago, to San Francisco, to Los Angeles, telling those people who were entrusted with the life savings of others that they shall not conceal—they shall not bear false witness to signatures. They shall not gamble with other people's money. They shall not take advantage of the uneducated."

(App. 863).

I believe that the foregoing events, combined with the grossly excessive awards, amply demonstrate that passion and prejudice invaded the trial. This being so, the proper action on our part is to order a new trial.

SEYMOUR, Circuit Judge, with whom McKAY, Circuit Judge, joins, concurring and dissenting.

The only point of disagreement between the majority panel opinion and the dissent is whether the jury's determination of liability was tainted by passion and prejudice, thus requiring a new trial. The dissent concludes that passion and prejudice did

infect the jury's determination of liability and that a new trial is required. The dissent bases that conclusion on what is perceived to be an excessive award of both actual and punitive damages, as well as the occurrence of emotional incidents during trial that the dissent believes inflamed the jury. The majority, on the other hand, concludes that passion and prejudice did *not* affect the finding of liability and that a new trial is therefore not mandated. With respect to the award of damages, the majority finds the actual damages not excessive; however, it finds the punitive damages so excessive that a remittitur is in order.

I agree with the majority opinion in all respects except in its conclusion that a portion of the punitive damages must be remitted. After reviewing the law and the record in this case, I am convinced the entire award should stand.

The district court concluded that passion and prejudice did not affect the jury's determination of liability:

"Considering the evidence as a whole, in my judgment, this jury verdict was produced not by any passion, prejudice or sympathy generated by the plaintiff's conduct or that of her husband; it was, rather, the product of a sense of outrage and indignation about the callous and cavalier conduct of the defendant's agent acting in complete disregard of the rights and sensitivies of the plaintiff whose emotional and economic security was in his hands."

*Malandris v. Merrill Lynch, Pierce, Fenner & Smith,* 447 F.Supp. 543, 547 (D.Colo.1977). This decision must be accorded great deference.[1] In my judgment the record supports the determination in this case.

Inferring passion and prejudice solely from the size of the verdict is unwarranted. Here, the dissent bases its conclusion both on the size of the verdict and on the occur-

rence of several emotional outbursts by Mrs. Malandris and her husband during the trial. However, I do not agree that these outbursts support the dissent's conclusion. The record contains abundant evidence of an outrageous course of conduct by defendant's broker. The district judge who heard the spontaneous outbursts, which were made in response to the broker's testimony portraying Mr. Malandris as a liar, viewed them as "genuine human responses to testimony which was not credible," *Id.* at 547. In addition, the judge considered Mrs. Malandris' reaction as a demonstration of the extent of her mental and emotional damage, creating no greater prejudice to the defendant than when a plaintiff who suffers physical injuries from the tort of another displays those injuries to the jury by appearing in the courtroom. *Id.* Viewing the incidents in the context of the trial, I am not led to an irresistible inference that the verdict on liability was the result of the outbursts rather than the jury's extreme indignation over the broker's activities.

I also agree with the panel majority that the amount of compensatory damages awarded Mrs. Malandris is not excessive. The record establishes that the jury was not considering minor emotional distress when it computed the damages but had before it evidence showing that Mrs. Malandris incurred extensive, possibly permanent, emotional injury that had destroyed her ability to function normally. Under these circumstances, the award of $1,000,000 does not shock my judicial conscience.

Notwithstanding my agreement with the panel majority thus far, I cannot concur in the remittitur ordered as to the punitive damages. I recognize that in some cases the award of punitive damages may be so excessive that it shocks the judicial conscience, even though the jury's resolution of the issue of liability is free from passion and prejudice. *See, e.g., Holmes v. Wack,* 464 F.2d 86, 89 & n. 3 (10th Cir.1972); 6A J.

---

**1.** One authority states that "[t]he trial court's determination as to whether the verdict is the result of the passion or prejudice will not be disturbed on appeal, unless the determination is clearly erroneous." 6A J. Moore, *Moore's*

*Federal Practice* ¶ 59.05[3] at 59–59 (1982). The trial court's denial of a motion for new trial will be reversed only upon a finding of a gross abuse of discretion. *Holmes v. Wack,* 464 F.2d 86, 89 (10th Cir.1972).

Moore, *Moore's Federal Practice* ¶ 59.05[3] at 59–67 to 68 (1982); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2820 at 133–35 (1973). In such cases, remittitur furthers both justice and judicial economy. However, after reviewing the record in this case, and considering the size of the corporate defendant and the reprehensible nature of the conduct giving rise to the injury, the amount of punitive damages assessed against Merrill Lynch does not shock my judicial conscience.

Ordering a remittitur in this case is particularly troublesome because no independent basis exists to support it apart from the size of the verdict. As the majority recognizes, the three to one ratio of punitive damages to actual damages is well within the range approved by Colorado law. Moreover, the assets of the defendant are vast and the conduct of its broker deplorable. Under these circumstances, an appellate court should be particularly reluctant to order a remittitur, especially when the jury's award has been upheld by the trial court on a motion for new trial. *See Hedrick v. Hercules Inc.*, 658 F.2d 1088, 1095 (5th Cir.1981); *Transok Pipeline Co. v. Darks*, 565 F.2d 1150, 1156 (10th Cir.1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); 11 C. Wright & A. Miller § 2820 at 135 (quoting *Taylor v. Washington Terminal Co.*, 409 F.2d 145, 148 (D.C.Cir.), *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969)).

An amount which one judicial conscience finds shocking may be entirely palatable to another, as is shown by the diverse reactions of the members of this court to the size of the verdict in this case. This state of affairs reveals the pitfalls inherent in judicial tinkering with the jury's determination of the amount of exemplary damages necessary to punish outrageous behavior and prevent its recurrence.

In sum, I agree with the dissent that the personal reactions of appellate judges standing alone are poorly suited to govern the modification of a punitive damage award. We are undeniably substituting our judgment for that of the jury and, in my view, encroaching upon its function. For these reasons, and because I conclude that the determination of liability is not the result of passion and prejudice and the award of compensatory damages does not shock my judicial conscience, I would affirm the award in its entirety.

SETH, Chief Judge, dissenting.

I must respectfully dissent from the majority opinion and also indicate a disagreement with some of the concurring opinions. In my view, the problem in this appeal does not arise from the fact of, nor from the amount of, the punitive damages. Instead, the error in the verdict and judgment is that the compensatory damages are excessive and were the result of passion and prejudice. The compensatory award was $1,030,000.00.

The record shows that the damages complained of were from a variety of sources, there were preexisting problems, the testimony was by lay witnesses as to their subjective evaluations, there were marital problems, the alleged forgery and the extensive participation by the husband. The amount of money involved must also be included. It was in this context that there was injected the passion and prejudice resulting mostly from the outbursts by the plaintiff in the courtroom. The result was that a large measure of punitive damages was included in the compensatory award. The amount of the compensatory damages is just too large to be otherwise explained. I don't think this can be cured by a reduction in the amount of punitive damages. The general view is that there should be no remittitur where there is passion and prejudice. Again, considering the amount of money invested by plaintiff and her then existing condition, the compensatory damage award must be grossly excessive.

It is apparent that appellate courts may order remittitur. The question remains as to how it should be exercised. I would limit it to formula cases, *Big O Tire Dealers v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir.), or double recovery cases and other instances where there is present some

adequate measure for a reduction. I find no measure whatever in the case before us and thus would hold that a remand for a new trial is required.

The awarded punitive amount is not too far out of line comparing it to the excessive compensatory award and the position of the defendant. The remittitur ordered by the majority moves the punitive award from the higher end of the ratio or scale to the lower end. This is done with the comments in the panel opinion that the award is excessive and unwarranted. This again points to the excessive nature of the compensatory award not the punitive damage award.

I would thus remand the case for a new trial on all issues.